John ADAMS, Linda Adams, Mike Johnson,
Ann Johnson, Verne Wilkie, Rosemary Wilkie,
Richard Massen and Darlene Massen,
Plaintiffs-Respondents,†

v.

STATE of Wisconsin Livestock Facilities Siting
Review Board, Defendant-Co-Appellant,

LARSON ACRES, INC., Intervenor-Appellant.

TOWN OF MAGNOLIA, Petitioner-Respondent,†

v.

STATE of Wisconsin Livestock Facilities Siting
Review Board, Respondent-Co-Appellant,

LARSON ACRES, INC., Intervenor-Appellant.

Court of Appeals

*No. 2009AP608. Oral argument February 17, 2010.
—Decided June 24, 2010.*

2010 WI App 88

(Also reported in 787 N.W.2d 941.)

† Petitions for Review filed.

On behalf of the intervenor-appellant, the cause was submitted on the briefs of *Eric M. McLeod* and *Michael P. Screnock* of *Michael Best & Friedrich LLP*, Madison. There was oral argument by *Eric M. McLeod*.

On behalf of the defendant-co-appellant and respondent-co-appellant, the cause was submitted on the briefs of *Robert M. Hunter*, assistant attorney general, and *J.B. Van Hollen*, attorney general. There was oral argument by *Robert M. Hunter*.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Christa Westerberg* of *McGillivray Westerberg & Bender LLC*, Madison, and

*Peter M. McKeever* of *Garvey McNeil & Associates, S.C.*, Madison. There was oral argument by *Christa Westerberg*.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Glenn C. Reynolds* and *Elizabeth Mackey* of *Reynolds & Associates*, Madison. There was oral argument by *Glenn C. Reynolds*.

A nonparty brief was filed by *Richard J. Stadelman* of *Wisconsin Towns Association* of Shawano for Wisconsin Towns Association.

A nonparty brief was filed by *William P. O'Connor* of *Wheeler, Van Sickle & Anderson, S.C.*, of Madison for Wisconsin Association of Lakes.

A nonparty brief was filed by *H. Dale Peterson* and *Krista R. Pleviak* of *Stroud, Willink & Howard, LLC* of Madison for Wisconsin Farm Bureau Federation, Cooperative, the Dairy Business Association, Inc., the Wisconsin Cheese-Makers' Association, and the Wisconsin Pork Association, Cooperative.

A joint nonparty brief was filed by *Marcia MacKenzie,* corporation counsel of Dane County, and *Carlos A. Pabellon,* assistant corporation counsel of Dane County for Dane County; *James N. Saul* of *Midwest Environmental Advocates, Inc.* of Madison for Town of Dunn and Family Farm Defenders; and *Melissa J. Malott* of *Clean Wisconsin* of Madison for Melissa Malott and George Meyer.

Before Vergeront, Lundsten and Higginbotham, JJ.

¶ 1. LUNDSTEN, J. Larson Acres, Inc., operates a large-scale dairy farm in the Town of Magnolia. Larson applied to the Town for approval of an expanded livestock facility. The Town approved the application, but attached conditions. Larson appealed to the Live-

stock Facility Siting Review Board, challenging the imposition of several conditions. The Board ordered that the expansion permit be reissued without the challenged conditions. The Town and Larson's neighbors—the Adamses, the Johnsons, the Wilkies, and the Massens—sought review in the circuit court. The circuit court vacated the Board's decision. Larson and the Board appeal.

¶ 2. Larson and the Board argue that the Board correctly determined that the conditions imposed by the Town violate the livestock facility siting law, Wis. Stat. § 93.90, and, therefore, the circuit court erred when it vacated the Board's decision.[1] We agree. We further agree with Larson and the Board that the Board properly reversed the improper conditions without reversing the permit in whole. Accordingly, we reverse the circuit court's order vacating the Board's decision.

### *Background*

¶ 3. Wisconsin's livestock facility siting and expansion law, Wis. Stat. § 93.90, was enacted "for the purpose of providing uniform regulation of livestock facilities." Wis. Stat. § 93.90(1). In particular, the law mandates that the Department of Agriculture promulgate rules specifying standards for the siting and expansion of livestock facilities. These rules and standards are found in Wis. Admin. Code ch. ATCP 51. As ch. ATCP 51 explains, § 93.90 allows, but does not require, political subdivisions to administer the siting approval process.[2]

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

[2] *See* Wis. Admin. Code § ATCP 51.10(2) ("[A] political subdivision may not deny a local approval covered by this chapter unless the political subdivision incorporates by local ordinance

¶ 4. The Town of Magnolia opted to administer the approval process. The Town's zoning ordinance, as amended for this purpose, states that it will "review applications for conditional use permits for new and expanded livestock facilities according to state law," invoking Wis. Stat. § 93.90 and Wis. Admin. Code ch. ATCP 51.

¶ 5. On May 2, 2006, Larson submitted an application to the Town for approval of an expanded livestock facility[3] to house 1500 "animal units."[4] After a public hearing, the Town issued findings of fact, conclusions of law, and a decision approving Larson's application. The Town found that the current facility's practices were violating state water quality standards and that the proposed expanded facility would continue to threaten the integrity of area surface water and groundwater. Citing its authority under the Town's

the standards in this subchapter . . . ."); *see also* ch. ATCP 51, prefatory note (clarifying that "[t]he livestock facility siting law *does not require* local approval"). Chapter ATCP 51's terms do not, however, provide for alternative approval authority if local authority is not exercised. *See* § ATCP 51.02(1) (stating that "[t]his chapter applies to local approvals").

[3] Larson's brief indicates that it sought a permit for a "new" heifer facility. However, Larson's application for local approval requests an "expanded" livestock facility, and it is apparent that there was already some sort of facility in place. Regardless, in this opinion we need not dwell on whether Larson seeks a new or expanded facility, as the distinction does not affect the disputed issues.

[4] "Animal unit" means "a unit of measure used to determine the total number of single animal types or combination of animal types, as specified in s. NR 243.11, that are at an animal feeding operation." *See* Wis. Stat. § 93.90(1m)(a) (cross-referencing Wis. Admin. Code § NR 243.03(3) (Sept. 2002) (quoted language is from the renumbered version at § NR 243.03(5) (Apr. 2007)).

zoning ordinance and WIS. STAT. § 93.90, the Town granted Larson's application for an expansion through a conditional use permit, and attached certain conditions. These conditions included a requirement mandating specified land use strategies "to substantially reduce and thereafter minimize nitrogen loading to surface and ground water." The conditions also required that Larson "exchange information with the Town concerning management practices of the Facility" and "allow access for testing well water at the Facility and access for the Town to test tile lines for water quality monitoring purposes monthly."

¶ 6. Larson appealed the Town's decision to the Livestock Facility Siting Review Board pursuant to WIS. STAT. § 93.90(5). Larson argued that the Town imposed several conditions in violation of § 93.90, including the conditions described above. Agreeing with Larson, the Board first concluded that "[t]he standards to be applied in this matter are those under s. 93.90, Stats., and ch. ATCP 51, Wis. Adm. Code, as there is nothing in the record to show the Town adopted more stringent standards in the manner required by s. 93.90(3)(ar), Stats." The Board then concluded that the challenged conditions incorrectly applied the state standards.[5] The

---

[5] The following permit conditions were challenged:

1. Larson shall provide the Town, within 60 days of this decision, a plan to utilize land use, farming, and nutrient management practices to substantially reduce and thereafter minimize nitrogen loading to surface and ground water using the following strategies:

a. No fall spreading of manure on tile drained or upland fields on the Cook Farm until nitrate pollution is substantially reduced.

b. Crop rotation to include alfalfa on the entire Cook farm in 3–4 year rotations beginning in 2008 and continuing

Board also found that "the Town was correct in granting Larson's permit" and ordered the Town to reissue the permit without the challenged conditions.

¶ 7. Pursuant to WIS. STAT. § 93.90(5)(e), the Town sought review of the Board's decision in circuit court, as did a number of Larson's neighbors. The circuit court consolidated the cases and, disagreeing with the Board, concluded that § 93.90 did not prevent the Town from attaching the conditions. The court vacated the Board's decision, and remanded to the Board with instructions to determine whether to affirm or reverse the permit "in whole."

over a 4-year period until the entire Cook Farm has been rotated and is consistent with the current farm conservation plan. The rotation plan shall include no less than 3 years of alfalfa for every year of corn planted on each acre.

c. Increased frequency of soil testing from once every four years to once a year, focusing on phosphorous and nitrogen contents of the soil to account for residual nitrogen in calculating spreading plans for the upcoming growing season.

2. Larson will exchange information with the Town concerning management practices of the Facility, including notification to the Town Chair of all changes in circumstances.

3. Larson will allow access for testing well water at the Facility and access for the Town to test tile lines for water quality monitoring purposes monthly, upon proper notice to the owners of the Facility unless such testing is required under the terms of a Wisconsin Pollution Discharge Elimination System Permit as issued by the Wisconsin Department of Natural Resources.

. . . .

5. Larson will comply with all provisions of the Town of Magnolia Zoning Ordinance and any other applicable federal, state, and local regulations and laws.

. . . .

7. The Town Board shall review the [conditional use permit] annually to assure itself that Larson is in compliance with the permit.

¶ 8. The Board and Larson appeal the circuit court's final order.

## Discussion

¶ 9. This case pits Larson and the Board against the Town and Larson's neighbors. All four parties have provided briefs and oral argument. For ease of discussion, we will attribute arguments made by either Larson or the Board, or both, to Larson. Similarly, we will attribute arguments made by the Town or the neighbors, or both, to the Town.

¶ 10. The parties raise three main issues: first, whether WIS. STAT. § 93.90 preempts the Town's preexisting authority to impose conditions when approving livestock facility siting or expansion; second, whether the conditions imposed by the Town comply with the requirements in § 93.90(3)(ar); and, third, whether the Board may reverse the Town's improper conditions without reversing the permit in whole.[6] We discuss each issue in turn.

### A. Whether WIS. STAT. § 93.90 Preempts The Town's Preexisting Authority To Impose Conditions

¶ 11. It is undisputed that, prior to the enactment of WIS. STAT. § 93.90, municipalities such as the Town

---

[6] The parties dispute the level of deference we should give the Board's decision. *See, e.g., Stoughton Trailers, Inc. v. LIRC,* 2007 WI 105, ¶ 26, 303 Wis. 2d 514, 735 N.W.2d 477 ("A reviewing court accords an interpretation of a statute by an administrative agency one of three levels of deference—great weight, due weight or no deference—based on the agency's expertise in the area of law at issue."). We need not resolve this dispute because, regardless of the level of deference, we would affirm the Board.

had the authority to regulate livestock operations, including the authority to impose conditions, by virtue of various statutes and local zoning ordinances. For example, municipalities had the power to impose locally generated conditions under WIS. STAT. § 62.23(7), which provides zoning authority in the interests of health, safety, and welfare.[7] The Town argues that a portion of this preexisting authority survives enactment of the livestock facility siting law. We agree with Larson that it does not.

■■

¶ 12. Under the preemption doctrine,

> local control must yield [to state law] if: (1) the legislature has clearly and expressly withdrawn the power of municipalities to act; (2) the local regulation logically conflicts with state legislation; (3) the local regulation defeats the purpose of state legislation; or (4) the local regulation violates the spirit of state legislation.

*American Transmission Co. v. Dane County*, 2009 WI App 126, ¶ 9, 321 Wis. 2d 138, 772 N.W.2d 731 (citing *DeRosso Landfill Co. v. City of Oak Creek*, 200 Wis. 2d 642, 657, 547 N.W.2d 770 (1996)). The interpretation of § 93.90 and its preemptive effect is a question of law. *See id.*, ¶ 8 n.5.

---

[7] *See, e.g., Town of Cedarburg v. Shewczyk*, 2003 WI App 10, ¶ 16, 259 Wis. 2d 818, 656 N.W.2d 491 (Ct. App. 2002) (noting municipalities' use of conditional use permits when implementing zoning laws and discussing WIS. STAT. § 62.23(7) in particular). The Town's zoning ordinance cites as authority village zoning powers exercised under WIS. STAT. § 60.62 and city planning powers exercised under WIS. STAT. §§ 61.35 and 62.23. *See* WIS. STAT. § 60.22(3) (allowing a town to exercise certain village powers if authorized by a resolution); WIS. STAT. § 61.35 (stating that § 62.23 applies to villages).

¶ 13. When interpreting statutory language, we give the language "its common, ordinary, and accepted meaning." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. Also, we interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46.

¶ 14. To address § 93.90's preemptive effect, it is necessary to read multiple provisions together. We begin with the relevant portions of § 93.90(1) and (2), which set out the law's purpose and the duties of the Department of Agriculture. We then turn to general political subdivision authority under § 93.90(3)(a). Finally, we address the subsections relating to conditional use permit requirements, in particular, § 93.90(3)(ae), (3)(am), and (3)(ar). As explained below, we conclude that § 93.90 preempts the Town's preexisting authority to impose conditions.

### 1. WISCONSIN STAT. § 93.90(1) and (2)

¶ 15. Subsection (1) of the livestock facility siting law contains a uniformity pronouncement: "This section is an enactment of statewide concern for the purpose of providing uniform regulation of livestock facilities." WIS. STAT. § 93.90(1). Subsection (2) of the law facilitates this uniformity objective by delegating to the Department of Agriculture the job of promulgating "rules specifying standards for siting and expanding livestock facilities." WIS. STAT. § 93.90(2). Specifically, sub. (2)(a) delegates to the Department the discretion whether to include standards relating to water quality

standards.[8] Uniformity results because, regardless whether the Department opts to include or exclude water quality standards, inclusion or exclusion will result in uniform siting requirements.

¶ 16. It is apparent that the legislature's directive to the Department of Agriculture in sub. (2) flows from the siting law's purpose in sub. (1): to provide "uniform regulation of livestock facilities." A state agency's statewide standards will result in more uniformity than the alternative, namely, different standards in different municipalities. This is true regardless of the content of the Department's standards.[9]

### 2. Political Subdivision Authority In WIS. STAT. § 93.90(3)(a)

¶ 17. The authority of political subdivisions to administer the livestock facility siting law is set forth in

---

[8] This subsection provides that "the department may incorporate by cross-reference provisions contained in rules promulgated under ss. 92.05(3)(c) and (k), 92.14(8), 92.16, and 281.16(3) and ch. 283." WIS. STAT. § 93.90(2)(a). Wisconsin Stat. § 281.16(3) and WIS. STAT. ch. 283 directly concern water quality standards. Wisconsin Stat. §§ 92.05 and 92.14 concern soil and water conservation and resource management programs that, in part, involve the consideration of water quality standards. Section 93.90(2)(a) also forbids the Department from promulgating livestock facility siting rules that conflict with rules promulgated under these sections.

[9] A list of general criteria that the Department of Agriculture's standards must meet is set out in WIS. STAT. § 93.90(2)(b). For example, the standards must be "[p]rotective of public health or safety," "[c]ost-effective," and "[d]esigned to balance the economic viability of farm operations with protecting natural resources and other community interests." See § 93.90(2)(b)1., 2., 6. The standards are found in subchapter II of WIS. ADMIN. CODE ch. ATCP 51.

§ 93.90(3). Pertinent here, sub. (3)(a) contains the following preemption language: "Notwithstanding ss. 33.455, 59.03(2)(a), 59.69, 60.10(2)(i), 60.61, 60.62, 61.34(1), 61.35, 62.11(5), 62.23, 66.0415, 92.07(2), 92.11, and 92.15(3)(a), a political subdivision may not disapprove or prohibit a livestock facility siting or expansion unless at least one of the following applies . . . ." WIS. STAT. § 93.90(3)(a). The list of statutes following "[n]otwithstanding" in sub. (3)(a) covers political subdivision powers to zone and to exercise various other powers. *See, e.g.,* WIS. STAT. § 62.23 (city planning powers); WIS. STAT. § 60.61 (towns' general zoning authority); WIS. STAT. § 59.03(2)(a) (regarding "home rule"); WIS. STAT. § 61.34(1) (powers of village boards); WIS. STAT. § 66.0415 (local regulation of offensive industries); WIS. STAT. § 92.11 ("To promote soil and water conservation or nonpoint source water pollution abatement, a county, city, village or town may enact ordinances for the regulation of land use, land management and pollutant management practices.").

¶ 18. Because sub. (3)(a) expressly refers to "disapprove or prohibit," it is undisputed that sub. (3)(a) nullifies the traditional power of municipalities when disapproving livestock facilities. The Town, however, asserts that sub. (3)(a) does not apply when a municipality *approves* a permit. This distinction, however, cannot be squared with the statutory language.

¶ 19. The key language, "may not disapprove or prohibit," plainly contemplates all decisions on siting and expansion applications. The double negative "may not disapprove" necessarily means "must approve." Properly read, sub. (3)(a) directs that a political subdivision *must* approve a livestock siting or expansion application, un-

689

less a listed exception applies.[10] Thus, sub. (3)(a)'s "[n]otwithstanding" preemption language does apply when municipalities approve applications.

¶ 20. Moreover, our reading of § 93.90(3) harmonizes it with § 93.90(1) and (2). As discussed above, sub. (1) states a goal of uniformity and sub. (2) effectuates that goal by mandating that the Department of Agriculture promulgate statewide standards. It is apparent that sub. (3)(a) flows from subs. (1) and (2), preempting local powers so that the Department's statewide-standard choices in fact provide uniformity. From a uniformity standpoint, this makes sense because the local imposition of standards would inevitably vary by locality—different local officials will make different judgment calls.

¶ 21. In sum, we agree with Larson that § 93.90(3)(a) generally preempts the Town's preexisting authority to impose conditions when it is *approving* a facility siting or expansion. At the same time, the legislature struck a balance. It did not insist on complete uniformity, regardless of local circumstances. As we explain below, the legislature, in subsequent statutory subsections, provided municipalities with limited

---

[10] These exceptions include, for example, instances where the facility will violate the Department of Agriculture's standards under § 93.90(2)(a). *See* Wis. Stat. § 93.90(3)(a)5. Subsection (3)(a) also provides for an exception where "more stringent" requirements than the state standards under sub. (2)(a) are violated, if certain prerequisites are met. *See* Wis. Stat. § 93.90(3)(a)6. A political subdivision may also disapprove an application where the facility would violate certain ordinances related to shoreland, wetland, or floodplain zoning or where the facility would violate building, electrical, or plumbing codes. *See* Wis. Stat. § 93.90(3)(a)3.-4. The Town does not contend that an exception in sub. (3)(a) applies to the Larson permit.

new authority to impose conditions. We now turn our attention to the parties' dispute over these subsections.

### 3. WISCONSIN STAT. § 93.90(3)(ae), (3)(am), and (3)(ar)

¶ 22. The Town, once again pointing to the "disapprove or prohibit" language in sub. (3)(a), argues that subs. (3)(ae), (3)(am), and (3)(ar) provide independent authority to approve siting or expansion permits, unrestrained by the preemption language in sub. (3)(a). More specifically, the Town asserts that subs. (3)(ae), (3)(am), and (3)(ar) apply when a municipality is *approving* an application, in contrast with sub. (3)(a), which applies when a municipality disapproves an application.

¶ 23. However, as we have explained, there is no such approval/disapproval dichotomy. Subsection (3)(a) applies to both approvals and disapprovals. But our rejection of this argument runs deeper. Subsections (3)(ae), (3)(am), and (3)(ar) are clearly designed to work with, not independent of, sub. (3)(a).

¶ 24. Subsection (3)(a) applies to all applications and it directs that applications must be approved unless one of several specified situations exist. Subsections (3)(ae), (3)(am), and (3)(ar) have a different complementary function: they specify circumstances in which a municipality must or may attach conditions to a permit approved under sub. (3)(a). Subsection (3)(ae) contains a mandate: "A political subdivision that requires a . . . conditional use permit . . . shall require compliance with the applicable state standards [promulgated by the Department of Agriculture pursuant to sub. (2)(a)] as a condition of issuing the . . . conditional use permit . . . ." Subsection (3)(am) authorizes, but does not require, municipalities to attach "a setback requirement that is less stringent than a setback requirement under sub. (2)(a)." Subsection (3)(ar) autho-

rizes, but does not require, municipalities to attach "a requirement that is more stringent than the state standards under sub. (2)(a)" if the municipality follows certain procedures.

¶ 25. Nothing in the three subsections suggests that they are independent of the limitation in sub. (3)(a). Rather, these subsections presuppose that a permit is being approved under sub. (3)(a) and they confer limited power to impose locally formulated conditions on such permits. Accordingly, it does not matter that these subsections do not repeat sub. (3)(a)'s preemption language.

¶ 26. Taking as a starting point our conclusion that sub. (3)(a)'s preemption language applies to approvals, the Town does not present a viable alternative argument as to why sub. (3)(a)'s preemption language does not apply to the imposition of the disputed conditions here. For example, the Town argues that it would be absurd for the siting law to withdraw local permitting authority "in favor of nothing." But, as we have explained, the legislature did not leave "nothing." It formulated a joint permitting system with broad State authority to establish standards and limited local authority to implement and, in certain circumstances, supplement those standards.

¶ 27. In a similarly unavailing argument, the Town contends that withdrawing all of a municipality's powers to regulate livestock siting would be a "drastic action that the Legislature would have had to specifically explain." But the legislature did not withdraw *all* local power, and there is no "explanation" requirement. The Town relies on two cases, but the portions of the cases it relies on stand for a different proposition—that, when the legislature makes a significant change in the law, it must or most logically will do so in a clear and

express manner. *See American Transmission Co.*, 321 Wis. 2d 138, ¶ 9 (preemption doctrine requires that local power be "clearly and expressly withdrawn"); *State v. Annala*, 168 Wis. 2d 453, 466, 484 N.W.2d 138 (1992) ("Had the legislature intended to effectuate this drastic change in the law [governing when an adult may be prosecuted for a crime committed as a child], it would have done so in an express and clearly understandable manner.").

¶ 28. The Town may be suggesting that the preemption language in § 93.90 is not sufficiently *express,* but *American Transmission* itself demonstrates that "clear" and "express" in this context need not take the form of specific language stating that local authority is preempted. Rather, in *American Transmission* it was sufficient when the statutory scheme directly addressed local authority and clearly replaced it with something else. *See American Transmission Co.*, 321 Wis. 2d 138, ¶¶ 1–2, 9, 17, 19 (concluding that local authority to apply ordinance requirements relating to matters that the Public Service Commission did or could have addressed were "expressly withdrawn" by a statute providing that "[i]f [a facility authorized by the Commission] is precluded or inhibited by a local ordinance, the installation and utilization of the facility may nevertheless proceed").[11]

---

[11] We also observe that the Town's zoning ordinance relies on particular authorizing statutes—Wis. Stat. §§ 60.62, 61.35, and 62.23—that are all specifically listed after "[n]otwithstanding" in § 93.90(3)(a). This listing makes preemption of the Town's zoning powers particularly clear. Additionally, we note that, even if we were to agree with the Town that some preexisting local powers are not *expressly* withdrawn, these powers would nonetheless run afoul of one or more of the remaining preemption tests for reasons that we discuss in the

¶ 29. Accordingly, we conclude that, when it mandated that a municipality must approve a siting or expansion notwithstanding existing powers and then provided for limited local authority in § 93.90's subsections, the legislature withdrew the Town's preexisting power to attach conditions to Larson's permit. It follows that the powers relied on by the Town are preempted to the extent that the powers are not provided by § 93.90.

*4. Policy Arguments Under Wis. Stat. § 93.90*

■

¶ 30. The Town suggests that the uniformity purpose of § 93.90 is served when municipalities enforce statewide water quality standards through the mechanism of conditions on livestock siting permits. The Town notes that such facilities are already bound by those laws and, therefore, the conditions the Town imposed on Larson did nothing more than require Larson to abide by uniform state standards. However, while the uniformity the Town is talking about may be desirable, the uniformity the legislature speaks of in § 93.90 is uniformity in requirements for obtaining siting or expansion approval. There simply is no statutory basis supporting the conclusion that municipalities are authorized to act outside of § 93.90's procedures to inject water quality standards into the siting process.

¶ 31. In closely related arguments, the Town contends that local enforcement of water quality standards complements § 93.90. As evidence, the Town notes that the Department is forbidden from creating standards

text above. For example, another basis for preemption is that "the local regulation defeats the purpose of state legislation." *American Transmission Co. v. Dane County*, 2009 WI App 126, ¶ 9, 321 Wis. 2d 138, 772 N.W.2d 731. Here, if municipalities retained their broad power to impose a wide range of conditions on siting permits, the uniformity goal of the legislature would be defeated.

that conflict with these rules.[12] *See* WIS. STAT. § 93.90(2)(a). And, the Town highlights the ultimate aim of its conditions—clean water. Pointing to regulatory gaps, the Town submits that area water quality will be impaired even if Larson complies with WIS. ADMIN. CODE ch. ATCP 51 standards.

¶ 32. These policy arguments might come into play if there was ambiguity in the statutory language or scheme, but there is none. Rather, these are arguments that were likely put to the legislature and the Department during their enactment and adoption processes. For example, municipalities and environmental groups likely urged the Department to adopt water quality standards, arguing that doing so would lead to tougher and more uniform enforcement of water quality standards. But the facts remain that the legislature gave that choice to the Department, and the Department chose not to include them. Thus, the Town's policy arguments amount to no more than reasons why the legislature and the Department should have made different choices.[13]

[12] For example, § 93.90(2)(a) forbids the Department from promulgating rules that conflict with rules promulgated under WIS. STAT. § 281.16(3). The Town notes that certain Department of Natural Resources regulations promulgated under § 281.16(3) envision a role for political subdivisions in implementing water quality standards. *See* WIS. ADMIN. CODE §§ NR 151.07(3) and NR 151.09.

[13] In a related argument, the Town finds it significant that the Board must consult with the Department of Agriculture or the Department of Natural Resources "[i]n a case that involves the application of requirements related to water quality." *See* WIS. STAT. § 93.90(5)(c). It is plain, however, that this provision applies *if* water quality requirements are part of the siting process, but does not speak to the circumstances in which such requirements are introduced into the process initially.

¶ 33. In concluding that the Town's powers are limited, we do not intend to minimize the Town's concerns. The Town points to the negative effect § 93.90 may have on its efforts to prevent water pollution, and we have no reason to doubt the Town's assertion that the area's "environmental features render the ground and surface water highly susceptible to nitrate contamination from manure." Our job, however, is to construe statutes as written, and the language of § 93.90 reveals a clear legislative decision to prioritize uniformity in the approval process, in part by limiting the authority of political subdivisions.[14]

¶ 34. Before turning to the second main issue—the validity of the Town's permit conditions under § 93.90(3)(ar)—we briefly discuss alternative arguments advanced by the Town in support of its proposition that it retains its preexisting authority to impose conditions.

### 5. Alternative Arguments Supporting Ongoing Town Authority

¶ 35. The Town points to language in the administrative code as support for the proposition that § 93.90 does not limit its ability to monitor compliance

---

[14] The Town argues that there is a distinction to be made between *initial* siting under § 93.90 and the authority to regulate the *ongoing* operations of a livestock facility, the latter of which the Town suggests is outside § 93.90's scope. We understand Larson to agree, at least in part, when Larson states that compliance with § 93.90 "does not relieve a livestock facility operator from complying with other laws, including water quality standards." However, to the extent the Town argues that it may achieve ongoing regulation *through* a livestock siting permit, we disagree for the reasons stated in the text above.

with water quality standards via permit conditions. The Town relies on the words "does not limit" in the following code provision:

> **(4)** TERMS OF APPROVAL. An approval under sub. (1) is conditioned on the operator's compliance with subch. II and representations made in the application for approval. This chapter *does not limit* a political subdivision's authority to do any of the following:
>
> (a) Monitor compliance.

WIS. ADMIN. CODE § ATCP 51.34(4) (emphasis added). The Town reads this provision as a statement that the Town retains authority to monitor compliance with state water quality standards and that the code chapter "does not limit" that authority. We disagree. The structure of this rule makes clear that it speaks to the authority of municipalities to "monitor compliance" with respect to "the operator's compliance with subch. II." And, as we have seen, subchapter II is limited to standards adopted by the Department of Agriculture. *See* ¶¶ 15–16 & nn.8–9, *supra.*

¶ 36. The Town also asks us to invoke the public trust doctrine, arguing that facilities such as Larson's may adversely affect navigable waterways, such as the nearby Norwegian Creek. The Town asserts that the doctrine renders invalid " '[e]fforts to serve or advance purely private interests to the detriment of the public interests protected by the trust' " (quoting *State v. Village of Lake Delton*, 93 Wis. 2d 78, 91, 286 N.W.2d 622 (Ct. App. 1979)). *See also Village of Lake Delton*, 93 Wis. 2d at 89–90 (noting that one of the doctrine's sources is WIS. CONST. art. IX, § 1). The Town's premise is that Larson's interpretation of § 93.90 violates the public trust doctrine because that interpretation would

"effectively prevent[] enforcement of state water quality standards on navigable waterways for the benefit of a [concentrated animal feeding operation]."

¶ 37. The Town's argument depends on the proposition that, as to sites subject to the siting law, the *only* effective means of enforcing water quality standards is by conditioning livestock siting permits on compliance with those standards. However, at best, the Town suggests reasons why imposing water quality conditions during the livestock siting and expansion permitting process is, to some unknown degree, a *more* effective means of enforcement. The Town does not point to fact finding that would support the conclusion that other enforcement mechanisms are not effective.[15] Therefore, the Town has not demonstrated a violation of the public trust doctrine.[16]

### B. Whether The Town Imposed Conditions In Compliance With Wis. Stat. § 93.90(3)(ar)

¶ 38. The Town contends that its conditions are permissible under § 93.90(3)(ar).[17] We disagree.

---

[15] For example, it is undisputed that Larson remains subject to other enforcement mechanisms, such as a nuisance abatement action, and that the Department of Natural Resources has the authority to regulate the facility.

[16] Our preemption analysis makes it unnecessary to address various other arguments made by the Town that assume there is no preemption. For example, the Town also suggests that certain conditions that are "innocuous" should be deemed valid because they are generally consistent with § 93.90. Additionally, the Town points to certain other implied powers that may attach to explicit statutory powers.

[17] The Town also suggests that conditions specifying "certain methods of achieving compliance from a range of acceptable options" should not be analyzed under § 93.90(3)(ar). The Town appears to be arguing that this "range of acceptable

■■

¶ 39. Section 93.90(3)(ar) contains three requirements that must be met before a municipality may impose a condition:

- The condition must be "a requirement that is more stringent than the state standards under sub. (2)(a)."

- The municipality must adopt "the requirement by ordinance before the applicant files the application for approval."

- The municipality must base the requirement "on reasonable and scientifically defensible findings of fact, adopted by the political subdivision, that clearly show that the requirement is necessary to protect public health or safety."[18]

Although the parties dispute all three requirements, we address only the adopt-findings requirement because we agree with Larson that this requirement was not met.

options" is found in or referenced by Wis. Admin. Code ch. ATCP 51, although Larson contests this. Regardless, limiting a facility's otherwise broader range of options is plainly a "more stringent" requirement as contemplated by § 93.90 and, therefore, must satisfy § 93.90(3)(ar).

[18] Wisconsin Stat. § 93.90(3)(ar) states:

(ar) Notwithstanding par. (ae) a political subdivision may apply to a new or expanded livestock facility described in par. (ae)1. or 2., as a condition of issuing a special exception or conditional use permit, a requirement that is more stringent than the state standards under sub. (2)(a) if the political subdivision does all of the following:

1. Adopts the requirement by ordinance before the applicant files the application for approval.

2. Bases the requirement on reasonable and scientifically defensible findings of fact, adopted by the political subdivision, that clearly show that the requirement is necessary to protect public health or safety.

¶ 40. The Town argues that it complied with the adopt-findings requirement when it incorporated into its local ordinance, by reference, certain environmental regulations.[19] This, the Town contends, complies with the adopt-findings requirement because the Town "effectively adopted the scientific bases" underlying these regulations. For support, the Town asserts that the environmental regulations underwent a rigorous approval process before becoming law and that § 93.90 cannot reasonably be read as requiring political subdivisions to duplicate this process. However, even if there might be a procedure that would permit local municipalities to piggyback onto findings made by another entity, we conclude that under no reasonable view did the Town adopt any findings of fact as required under § 93.90(3)(ar)2.

¶ 41. Subsection 93.90(3)(ar)2. states that a political subdivision must base a more stringent requirement "on reasonable and scientifically defensible *findings of fact, adopted by the political subdivision,* that clearly show that the requirement is necessary to protect public health or safety" (emphasis added). The Town contends that a municipality need not actually adopt findings of fact. Rather, according to the Town, it is sufficient if a requirement can be shown to be supported by "reasonable and scientifically defensible factual findings," even if the source of the defensible findings is a separate entity. This argument, in effect,

---

[19] In particular, the Town's 1977 ordinance incorporated by reference WIS. ADMIN. CODE ch. NR 102, concerning water quality standards for Wisconsin surface waters. The Town's 2006 ordinance amendment additionally incorporates by reference "applicable Federal drinking water regulations" and chs. NR 140, NR 141, and NR 809, which concern groundwater and drinking water.

asks us to read out of the statute the requirement that the findings be "adopted by the political subdivision." This we may not do. *See Kalal*, 271 Wis. 2d 633, ¶ 46 ("Statutory language is read where possible to give reasonable effect to every word . . . .").

¶ 42. We observe that by resolving this issue on narrow grounds we leave many questions unanswered. For example, we do not address whether the Town is correct in its assertion that, under our interpretation, the Town will be forced to duplicate rigorous and, presumably, costly fact finding. Similarly, we do not address Larson's apparent assertion that the legislature contemplated that the Department of Agriculture would adopt standards sufficient for most locales and that § 93.90(3)(ar) was created to authorize municipalities to impose more stringent requirements based on local characteristics of the land or other local circumstances. If Larson's view is correct, then § 93.90(3)(ar) might have been put in place so that municipalities could demonstrate the need for more stringent conditions based on local circumstances, thus necessitating fact finding tied to local circumstances rather than the sort of fact finding that likely underpins statewide standards. However, because the Town does not point to *any* fact finding, this case does not present a vehicle for exploring this topic in greater depth.

¶ 43. Before moving on, we pause to comment on the parties' dispute over whether the contested conditions meet the requirement that they be "more stringent than the state standards under sub. (2)(a)." *See* WIS. STAT. § 93.90(3)(ar). Larson argues that the "more stringent" requirements under sub. (3)(ar) must fall within one of the categories established by the Department of Agriculture in WIS. ADMIN. CODE ch. ATCP 51,

subchapter II.[20] To conclude otherwise, Larson contends, would undermine § 93.90's goal of uniformity. We understand the Town to be arguing a contrary view—that "more stringent" simply refers to conditions *in addition to* the standards found in ch. ATCP 51. We observe that, were it necessary, we would have difficulty resolving this issue based on the record and arguments before us. Neither the record nor the briefs sufficiently educate us as to the content and nature of the disputed conditions and their relationship to standards adopted by the Department of Agriculture. In order to discern whether one is more stringent than the other, we would need an in-depth understanding of each.

### C. The Board's Authority To Reverse Conditions

¶ 44. The Town argues that the Board may not reverse individual conditions but instead may only reverse in whole. The Town points to § 93.90(5)(d), which provides: "If the board determines that a challenge is valid, the board shall reverse *the decision* of the political subdivision." (Emphasis added.) According to the Town, this language, with its reference to "the decision," can only mean that the entire decision shall be reversed if the Board determines that a challenge is valid.[21]

---

[20] Larson identifies these categories as the location of livestock structures, odor and air emissions, nutrient management, waste storage facilities, and runoff management.

[21] Although the Town's briefs sometimes speak in terms of whether the Board had the authority to "modify" the Town's decision, the parties do not actually discuss, and we do not decide, whether the Board may modify a particular condition to bring it into compliance with the law. Here, one of the imposed conditions broadly called for information concerning the

¶ 45. The scope of the Board's authority under § 93.90(5) is a question of statutory interpretation. *See Madison Landfills, Inc. v. Libby Landfill Negotiating Comm.,* 179 Wis. 2d 815, 824–25, 509 N.W.2d 307 (Ct. App. 1993) (the meaning of a statute is a question of law), *aff'd,* 188 Wis. 2d 613, 524 N.W.2d 883 (1994). We conclude that the Board acted within its powers.

¶ 46. Section 93.90(5) outlines the process for reviewing siting decisions. That section states, in relevant part:

> (b) An aggrieved person may challenge the decision of a political subdivision on an application for approval on the grounds that the political subdivision incorrectly applied the state standards under sub. (2)(a) that are applicable to the livestock facility siting or expansion or *violated sub. (3),* by requesting the board to review the decision . . . .
>
> . . . .
>
> (d) If the board determines that a challenge is valid, *the board shall reverse the decision of the political subdivision.* The decision of the board is binding on the political subdivision . . . .

Wis. Stat. § 93.90(5) (emphasis added).

¶ 47. The previous sections of this opinion demonstrate that the Town properly approved Larson's application under § 93.90(3)(a), but also improperly

facility's management practices. The Board concluded that "the information requested must be limited to information needed to monitor compliance with standards pursuant to ch. ATCP 51, subchapter II, Wis. Adm. Code." As limited by the Board, this condition simply states what would be true with or without the condition. *See* Wis. Admin. Code § ATCP 51.34(4) (referring to monitoring of "the operator's compliance with subch. II"). We do not address the propriety of the modification of this condition.

imposed the disputed conditions. When Larson appealed to the Board, Larson did not challenge the decision to approve the application; rather, Larson challenged the decision to impose the conditions.

¶ 48. The question then is whether the term "decision" in § 93.90(5)(d) refers solely to the decision to approve an application or, instead, may also be read as referring to both the decision to approve and related individual decisions, such as a decision to impose a condition. We conclude that the latter is the only reasonable reading of the subsection.

¶ 49. Under the Town's reading, the Board would be forced to reverse proper approval decisions because of improper and easily severed conditions. Indeed, the Board would be forced to reverse an approval that was required by the terms of § 93.90(3)(a), which mandates approval in the absence of specified circumstances. We agree with Larson that this reading leads to the absurd result that some applicants will face the untenable choice of either accepting an improper condition or seeking wholesale reversal of both the approval and the condition, thereby getting the "remedy" of starting the application process over again. The Town does not dispute that a reversal in whole by the Board means that the applicant must start the process over.[22]

¶ 50. The Town posits that it might have withheld approval had it known that one or more of its conditions would be rejected by the Board. The legal assumption underlying this point is that the Town could have

[22] To be clear, the Town does dispute a part of Larson's argument on which we do not rely. Larson additionally complained that it would have been forced to return to the "same hostile political subdivision" to start the application process over. We agree with the Town that we may not presume that it would act in bad faith if the matter was returned to it.

withheld approval if it was unable to impose conditions that adequately protected water quality. The Town does not, however, explain how this assumption squares with the statutory scheme. As we explained in section A above, approval is governed by § 93.90(3)(a) and does not hinge on whether or which conditions are attached.

¶ 51. We do, however, agree with the Town that there may be situations where it is appropriate to reverse an entire decision because of faulty conditions. This might be true, for example, where, had the municipality known that a critical condition was defective, it could have imposed an alternative proper condition. We leave this issue for another day. Here, the Town has not made the alternative argument that, if its statutory interpretation argument is wrong, the matter should be remanded so that the Town may attach alternative *proper* conditions.

¶ 52. To summarize, we hold that the Board may reverse individual improper conditions without reversing a livestock siting or expansion approval in whole, at least in the absence of an argument by the approving municipality or other interested party that the defective conditions could be replaced with proper conditions. Applying this holding here, we conclude that the Board acted within its authority when it left the approval in place and struck down specific improper conditions.

### Conclusion

¶ 53. For the reasons stated above, we reverse the circuit court's order vacating the Board's decision.

*By the Court.*—Order reversed.