John ADAMS, Linda Adams, Mike Johnson,
Ann Johnson, Verne Wilkie, Rosemary Wilkie,
Richard Massen and Darlene Massen,
Plaintiffs-Respondents-Petitioners,

v.

STATE of Wisconsin LIVESTOCK FACILITIES
SITING REVIEW BOARD,
Defendant-Co-Appellant,

LARSON ACRES, INC.,
Intervenor-Appellant.

TOWN OF MAGNOLIA,
Petitioner-Respondent-Petitioner,

v.

STATE of Wisconsin LIVESTOCK FACILITIES
SITING REVIEW BOARD, Respondent-Co-Appellant,

LARSON ACRES, INC.,
Intervenor-Appellant.

Supreme Court

*No. 2009AP608. Oral argument September 7, 2011.
—Decided July 11, 2012.*

2012 WI 85

(Also reported in 820 N.W.2d 404.)

444

448

For the petitioner-respondent-petitioner there were briefs filed by *Glenn C. Reynolds, Rebecca A. Paulson,* and *Reynolds & Associates,* Madison, and oral argument by *Glenn C. Reynolds.*

For the plaintiff-respondent-petitioners there were briefs filed by *Christa Westerberg* and *McGillivray, Westerberg & Bender LLC,* Madison, and *Peter M. McKeever* and *Garvey McNeil & Associates, S.C.,* Madison, and oral argument by *Christa Westerberg.*

For the intervener-appellant there was a brief by *Eric M. McLeod, Michael P. Screnock,* and *Michael Best & Friedrich LLP,* Madison, and oral argument by *Eric M. McLeod.*

For the respondent-co-appellant the cause was argued by *Robert M. Hunter,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

Amicus curiae briefs were filed on behalf of Wisconsin Farm Bureau Federation, Cooperative, The Dairy

Business Association, Inc., The Wisconsin Cheese-Makers' Association, and the Wisconsin Pork Association, Cooperative, by *H. Dale Peterson, Krista R. Pleviak,* and *Stroud, Willink, & Howards, LLC*, Madison, Wisconsin Lakes Association, River Alliance of Wisconsin, and Wisconsin Trout Unlimited by *Jodi Habush* of Midwest Environmental Advocates, Madison, Family Farm Defenders, Inc. and Wisconsin Farmers Union by *Lester A. Pines, Jeffrey L. Vercauteren,* and *Cullen Weston Pines & Bach, LLP*, Madison and *Kara Slaughter* of the *Wisconsin Farmers Union*, Madison, Wisconsin Counties Association and Wisconsin Towns Association by *Patrick Henneger, Andrew T. Phillips, Daniel J. Borowski,* and *Phillips Borowski, S.C.*, Mequon, and *Richard J. Stadelman* and the *Wisconsin Towns Association*, Shawano.

¶ 1. MICHAEL J. GABLEMAN, J. We review a published decision of the court of appeals[1] reversing an order of the Rock County Circuit Court, James E. Welker, Judge. The circuit court order reversed and remanded the cause to the State Livestock Facilities Siting Review Board ("Siting Board"), which had affirmed with modifications a permit issued by the Town of Magnolia ("Town"). The Town had granted an application for a livestock facility siting permit submitted by Larson Acres, Inc. ("Larson"), but imposed several conditions on the permit.

¶ 2. In Wisconsin, as in states all over the country,[2] the legislature has taken steps to balance the important interest in protecting precious natural re-

---

[1] *Adams v. State Livestock Facilities Siting Review Bd.,* 2010 WI App 88, 327 Wis. 2d 676, 787 N.W.2d 941.

[2] *See generally* Jody M. Endres & Margaret R. Grossman, *Air Emissions from Animal Feeding Operations: Can State*

sources with the important interest in encouraging a robust and efficient agricultural economy. As a central component of balancing these interests, the legislature has strictly limited the ability of political subdivisions to regulate the livestock facility siting process. The Town stepped over those limitations when it impermissibly conditioned the terms of a siting permit without following the guidelines set forth by the legislature. Because the Town's actions were violative of the Siting Law, the court of appeals was correct to find the challenged conditions in the permit invalid, and we therefore affirm.

## I. BACKGROUND

¶ 3. As reflected by the voluminous record, the history between the parties is a long and rancorous one. The facts presented are only those relevant to the disposition of the appeal.

¶ 4. The narrative begins in 1977. That year, the Town passed its first zoning ordinance. The ordinance included a section entitled, "Water Quality Protection," which provided a general prohibition on pollutants, followed by this more specific clause:

> [N]o activity shall discharge any liquid, gaseous, or solid materials so as to exceed or contribute toward the exceeding of the minimum standards and those other standards and the application of those standards set forth in [Wis. Admin. Code ch. NR 102] for all navigable waters.

Magnolia, Wis., Ordinance (July 26, 1977).

*Rules Help?*, 13 Penn St. Envtl L. Rev. 1, 7–43 (2004) (surveying regulatory approaches to livestock farming in various states).

¶ 5. Twenty-seven years elapsed. In 2004, the Wisconsin legislature passed, and the governor signed into law, Wisconsin Statutes section 93.90 (2003–04) ("Siting Law"),[3] an act regulating "livestock facility siting and expansion." As suggested by its title, the Siting Law established various procedures for livestock farm operators to apply for, and receive, permits from political subdivisions[4] allowing them to locate their facilities in particular areas.

¶ 6. The following year, the Town adopted the Siting Law as part of its zoning ordinance.

¶ 7. One provision of the Siting Law directed the Department of Agriculture, Trade and Consumer Protection ("Department") to draw up rules providing more specific, precise guidelines for the new permitting process. Wis. Stat. § 93.90(2)(a) (2005–06).[5] After an extensive rulemaking process, the Department fulfilled its legal duty and promulgated Wisconsin Administrative Code ch. ATCP 51 ("ATCP 51") on May 1, 2006.

¶ 8. The next day, Larson filed an application with the Town for a conditional use permit[6] ("CUP") for a

---

[3] When referring to the statute as a whole, we use the term, "Siting Law." When referring to specific sections of the statute, we cite to the particular provision.

[4] For purposes of the statute, and of this opinion, " 'Political subdivision' means a city, village, town, or county." Wisconsin Statutes section 93.90(1m)(f) (2005–06).

[5] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[6] Conditional use permits are "flexibility devices, which are designed to cope with situations where a particular use, although not inherently inconsistent with the use classification of a particular zone, may well create special problems and hazards if allowed to develop and locate as a matter of right in [a] particular zone." *Town of Rhine v. Bizzell,* 2008 WI 76, ¶ 23, 311 Wis. 2d 1, 751 N.W.2d 780 (internal quotation marks and citations omitted).

facility to house 1,500 "animal units."[7] [8]

¶ 9. Approximately three weeks later, on May 24, 2006, the Town adopted a revised zoning ordinance. The new ordinance recited the same language from the water quality protection provision quoted above, but appended several words at the end:

> In addition, no activity shall discharge any liquid, gaseous, or solid materials so as to exceed or contribute toward the exceeding of the minimum standards and the application of those standards set forth in [Wis. Admin. Code ch. NR 102] for all navigable waters *and [chs. NR 140, 141 and 809] for groundwater and drinking water and applicable federal drinking water regulations.*

Magnolia, Wis., Ordinance (May 24, 2006) (emphasis added).

¶ 10. After a lengthy dispute regarding the sufficiency of Larson's application, the Town deemed it complete and scheduled a public hearing. The hearing's organization followed formal, quasi-judicial lines: witnesses were sworn and examined by attorneys from both sides,[9] and arguments were presented to the

---

[7] An animal unit is "a unit of measure used to determine the total number of single animal types or combination of animal types." Wis. Stat. § 93.90(1m)(a) (incorporating Wis. Admin. Code § NR 243.03(3) (later renumbered § 243.03(5))). Under this system of measurement, a steer is 1 animal unit and a milking cow is 1.4 animal units. § 243.03(5) tbl. 2A.

[8] As a result of previous litigation and settlement, Larson was apparently operating in the absence of a permit when it applied. There was some ambiguity below as to whether the application was for a new facility or an expanded one. The parties do not suggest that the ambiguity, whatever it was, has any bearing on the outcome of the case, so we do not address the question.

[9] By this point, a third lawyer, representing John and Linda Adams, as well as other individual citizens in the area, was

Board. Most of the day was devoted to testimony from several expert witnesses retained by the Town. Two of the experts were scientists who spoke at length about the environmental damage they believed the farm was inflicting, and the risks its operations posed, to the water quality of Norwegian Creek (running through the Town) and to the Town's drinking water. Larson submitted the results of various studies and reports to the Town, stressed that the alleged environmental problems had not been definitively linked to the farm, and reiterated that it read the Siting Law as forbidding the imposition of any conditions taken from outside ATCP 51's parameters.

¶ 11. On March 27, 2007, the Town Board issued its decision. It granted the CUP with seven conditions, "imposed for the purpose of protecting the Town's ground and surface water." The conditions, quoted in their entirety, were:

1. Larson shall provide the Town, within 60 days of this decision, a plan to utilize land use, farming, and nutrient management practices to substantially reduce and thereafter minimize nitrogen loading to surface and ground water using the following strategies:

 a. No fall spreading of manure on tile drained or upland field on the Cook [F]arm until nitrate pollution is substantially reduced.

 b. Crop rotation to include alfalfa on the entire Cook [F]arm in 3–4 year rotations beginning

---

participating in the proceedings and opposing the CUP (or, in the alternative, supporting it with the imposition of numerous conditions). This group later filed a separate petition for review in circuit court after the Siting Board's ruling. Their claim was subsequently consolidated with the Town's, and the two claims appear here as one.

454

in 2008 and continuing over a 4–year period until the entire Cook Farm has been rotated and is consistent with the current farm conservation plan. The rotation plan shall include no less than 3 years of alfalfa for every year of corn planted on each acre.

 c. Increased frequency of soil testing from once every four years to once a year, focusing on phosphorous and nitrogen contents of the soil to account for residual nitrogen in calculating spreading plans for the upcoming growing season.

2. Larson will exchange information with the Town concerning management practices of the Facility, including notification to the Town Chair of all changes in circumstances.

3. Larson will allow access for testing well water at the Facility and access for the Town to test tile lines for water quality monitoring purposes monthly, upon proper notice to the owners of the Facility unless such testing is required under the terms of a Wisconsin Pollution Discharge Elimination System Permit ["WPDES Permit"] as issued by the Wisconsin Department of Natural Resources ["DNR"].[10]

4. Larson will submit nutrient plans and update annually as required under WPDES to the Town of Magnolia as well as to the DNR.

5. Larson will comply with all provisions of the Town of Magnolia Zoning Ordinance and any other applicable federal, state, and local regulations and law.

6. If water quality monitoring or testing is required under the terms of a WPDES permit as issued by

---

[10] A WPDES permit is a certification provided by the DNR under authority delegated by the federal Environmental Protection Agency. *See* Wis. Stat. ch. 283.

the Wisconsin [DNR], the Town shall be provided with all records and information provided by Larson Acres to the DNR.

7. The Town Board shall review the CUP annually to assure itself that Larson is in compliance with the permit.

¶ 12. The conditions were preceded by sections labeled "findings of fact" and "conclusions of law," which emphasized the ecological dangers posed by the farm to fish and other aquatic life, as well as the health risks posed to residents' drinking water. The Town Board determined that it would have been within its rights to deny the application outright, but concluded that the better course was to grant it with the conditions.

¶ 13. Larson appealed the Town's decision to the Siting Board, challenging conditions one, two, three, five, and seven.

## II. PROCEDURAL HISTORY

¶ 14. After extensive briefing from the litigants, and after two lengthy meetings, the Siting Board issued its decision and affirmed the granting of the permit, while imposing its own substantial modifications.

¶ 15. In its conclusions of law, the Siting Board determined as an initial matter that the Board was correct to grant the application because Larson had satisfied all of the requirements laid out by the Siting Law and ATCP 51. The Siting Board also affirmed the Town's authority to impose conditions in a CUP, but it restricted such conditions to those based on the standards incorporated into ATCP 51.

¶ 16. The Siting Board reviewed the challenged conditions and determined that each exceeded the Town's legal authority. In particular, the Siting Board

reversed four of the five challenged conditions: one, three, five, and seven. Those conditions, respectively, required Larson to provide a nutrient management plan according to specified strategies; allowed the Town access to Larson's farm for testing purposes; mandated compliance with the zoning ordinance "and any other applicable federal, state, and local regulations and law"; and provided that the Town would review the CUP annually to confirm compliance with its terms. The Siting Board affirmed conditions four and six, both of which essentially required Larson to provide to the Town any materials that it submitted to the DNR as part of the WPDES permit process.[11] Finally, it modified condition two, which required Larson to exchange information with the Town concerning its "management practices," by limiting such information to that needed by the Town in order for it to monitor compliance with the standards in the Siting Law and ATCP 51.

¶ 17. The Town appealed to circuit court. Applying a de novo standard of review, the circuit court vacated and remanded the cause to the Siting Board. It interpreted the Siting Law as having no preemptory effect on political subdivisions' powers that existed prior to the enactment of the Siting Law. Instead, the court concluded, the law simply forced political subdivisions to follow specific procedures when they wanted to impose standards more stringent than the state's. In the circuit court's view, the Town imposed no such standards because the requirements in condition five of

---

[11] Larson declined to challenge conditions four and six at the Siting Board, and does not challenge them here. They are consequently not before the court, and will not be addressed in the analysis.

the CUP[12] were drawn from the state's own administrative code. Accordingly, the court concluded that the Town acted within its lawful authority when it imposed the conditions.

¶ 18. In contrast, the circuit court regarded the Siting Board as acting outside of its lawful authority when it modified the permit, interpreting the Siting Law and ATCP 51 as limiting the Board's options to outright reversals or affirmances of challenged permits. Consequently, the court vacated the Siting Board's ruling and remanded the cause to the Siting Board for a determination of whether the permit should be affirmed or reversed in its entirety. Acknowledging that the issues raised were difficult and novel ones, and predicting that they would ultimately be resolved by appellate courts, the circuit court ordered that Larson be permitted to continue operating its facility as before until all appeals were disposed of.

¶ 19. Larson appealed. In a published decision, the court of appeals reversed the circuit court. *Adams v. State Livestock Facilities Siting Review Bd.*, 2010 WI App 88, 327 Wis. 2d 676, 787 N.W.2d 941. It began by demurring on the question of the appropriate standard of review, concluding that it would reverse under any standard. *Id.*, ¶ 10 n.6. The court went on to consider three issues: 1) whether the Town was required to act within the constrictions of the Siting Law in conditioning the permit; 2) whether the Town's conditions were proper under the Siting Law; and 3) whether the Siting Board was authorized to modify the CUP.

---

[12] The circuit court focused its legal analysis of whether the conditions were improper almost entirely on the administrative chapters referenced in condition five.

458

¶ 20. On the first issue, the court of appeals determined that the Siting Law preempted the Town's actions. The court grounded its decision on the distinction between uniformity in the regulation of farming operations and uniformity in the regulation of siting. *Id.,* ¶¶ 11–35. It also rejected the Town's invocation of the public trust doctrine,[13] emphasizing that several other mechanisms exist by which the challenged standards could be enforced. *Id.,* ¶¶ 36–37.

¶ 21. On the issue of whether the Town acted within the Siting Law's parameters, the court tied its reversal to a question the trial judge elided: whether the Town adopted factual findings to justify the standards incorporated into the zoning ordinance, as required by Wis. Stat. § 93.90(3)(ar). *Id.,* ¶ 39. In the court's opinion, the Town had not. "[U]nder no reasonable view," the court of appeals concluded, "did the [T]own adopt any findings of fact" to support the regulations at issue, and they were therefore barred by the Siting Law from applying them in a CUP in the siting process. *Id.,* ¶ 40.

¶ 22. Finally, the court of appeals rejected the circuit court's limiting of the Siting Board to reversals and affirmances. *Id.,* ¶¶ 44–51. Under the trial court's ruling, the court of appeals reasoned, an "absurd result" obtains: the Siting Board is forced to instruct applicants dissatisfied with the terms of their CUPs that their only relief, if they "win," is to return to the beginning of an

---

[13] Under the public trust doctrine, the legislature and local governments are "bound by [their] duty to protect the navigable waters of the state for the citizens' benefit" and "to evaluate," before acting to affect the water, "all potential benefits that can be derived from water, including its use for drinking." Gabe Johnson-Karp, *That the Waters Shall Be Forever Free: Navigating Wisconsin's Obligations under the Public Trust Doctrine and the Great Lakes Compact,* 94 Marq. L. Rev. 415, 422 & n.37 (2010).

application process they have already completed. *Id.,* ¶ 49.

¶ 23. The Town petitioned this court for review. After more than four years of litigation in four judicial and quasi-judicial forums, the time has now come to resolve the important and novel issues raised by this case.

## III. STANDARD OF REVIEW

¶ 24. When considering the decision of an administrative agency, this court reviews the agency's ruling, not the circuit court's. *Coulee Catholic Schools v. LIRC,* 2009 WI 88, ¶ 31, 320 Wis. 2d 275, 768 N.W.2d 868 (citing *Liberty Trucking Co. v. DILHR,* 57 Wis. 2d 331, 342, 204 N.W.2d 457 (1973)). The question of whether the state preempted the Town's actions is a matter of law that we "review independently, benefitting from the analyses of the circuit court and the court of appeals." *DeRosso Landfill Co. v. City of Oak Creek,* 200 Wis. 2d 642, 652, 547 N.W.2d 770 (1996).

¶ 25. Although the parties dispute the appropriate level of deference to give the Siting Board's legal determinations,[14] the question is not a difficult one. Both Larson and the Siting Board accurately cite well-established precedent requiring de novo review of legal conclusions by administrative agencies when the issues presented are of first impression. *Clean Wisconsin, Inc. v. Pub. Serv. Comm'n of Wis.,* 2005 WI 93, ¶ 43, 282

---

[14] Adams contends that the Town's legal conclusions deserve deference because they interpret its own zoning ordinance. However, since we review the Siting Board's determinations of law, not the Town's, we need not decide the standard of review that would apply to the Town's conclusions.

Wis. 2d 250, 700 N.W.2d 768 (affirming that "an agency's interpretation of a statute is given no weight at all . . . when the issue is clearly one of first impression for the agency . . . ."); *Coutts v. Wis. Ret. Bd.,* 209 Wis. 2d 655, ¶ 14, 562 N.W.2d 917 (1997) (same). There has never been any contention that the Board had *any* experience interpreting the laws and rules at issue here prior to this case, nor that any other adjudicatory body did. Indeed, the Siting Board acknowledged in its opinion that Larson's appeal was the first claim it ever handled.

¶ 26. Even if we were to accept Larson and the Siting Board's argument that there are circumstances in which an agency's legal answers to questions of first impression deserve judicial deference, those circumstances are not present here. The Siting Board was deliberating for the first time in its history, interpreting a brand-new, complex regulatory scheme, in the absence of any controlling authority from appellate courts, and considering several questions that implicated the scope of the Board's own power. Aside from the first-impression issue, there are thus several additional reasons for us not to defer to its legal conclusions. *See, e.g., Andersen v. DNR,* 2011 WI 19, ¶ 25, 332 Wis. 2d 41, 796 N.W.2d 1 ("The extent of [an] agency's statutory authority is a question of law which we review independently and without deference to the agency's determination."). For the reasons set forth above, our review is de novo.

## IV. DISCUSSION

¶ 27. This case presents a set of narrow but complex questions. All of the issues before the court require us to determine whether the Town's actions

were preempted by the Siting Law. Therefore, we first undertake a detailed look at Wisconsin's preemption doctrine in order to establish a foundation upon which to analyze the plain language of the statute and the Town's actions. Second, we analyze the plain language of the Siting Law and determine that it preempts political subdivisions from regulating livestock facility siting in any manner inconsistent with the Siting Law. Third, we evaluate whether the Town's actions were consistent with the Siting Law, and determine that they were not. Finally, we evaluate whether the Siting Board was entitled to modify the conditions of the siting permit, and conclude that it was.

## A. Preemption

¶ 28. Preemption is a threshold question because it is clear (and undisputed) that prior to the enactment of the Siting Law, the Town would have had the authority to condition the permit as it did. Therefore, if the Siting Law does not preempt the Town's authority to impose the challenged conditions, the Town acted within its legal powers and our analysis need proceed no further.

### 1. The Home Rule Amendment and Issues of Statewide Concern

¶ 29. Longstanding Wisconsin law supports the proposition that political subdivisions retain their ability to govern in the absence of state legislation. *See State ex rel. Ekern v. Milwaukee,* 190 Wis. 633, 637, 639, 209 N.W. 860 (1926). A constitutional amendment reinforced the importance of this bedrock principle in 1924.

Wis. Const. art. XI, § 3.[15] However, the legislature may, on issues of statewide concern, prohibit political subdivisions from enacting ordinances, or invalidate ordinances already promulgated. *See, e.g., DeRosso,* 200 Wis. 2d at 651.

¶ 30. Legislative enactments fall into one of three categories: exclusive statewide concern, exclusive local concern, or a "mixed bag" of both state and local concern. *State ex rel. Michalek v. LeGrand,* 77 Wis. 2d 520, 527, 253 N.W.2d 505 (1977) (citing *Van Gilder v. City of Madison,* 222 Wis. 58, 82, 267 N.W. 25 (1936)).

¶ 31. We conclude that livestock facility siting is an issue of statewide concern. We base this conclusion on the purpose of the Siting Law as articulated by its plain language. Wis. Stat. § 93.90(1) (stating that the Siting Law is an "enactment of statewide concern for the purpose of providing uniform regulation of livestock facilities"). However, livestock facility siting is not a matter of exclusive statewide concern.[16] Livestock facility siting clearly affects local concerns, and has been traditionally regulated at the local level. Accordingly,

---

[15] Wis. Const. art. XI, § 3 states: "Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village." For a more detailed treatment of the history of the home rule amendment, *see generally* Robert W. Hansen, *Municipal Home Rule in Wisconsin,* 21 Marq. L. Rev. 74 (1937).

[16] Livestock facility siting does not fall into any of the "traditional" categories of exclusive statewide concern enumerated in *Van Gilder. Van Gilder* provides, as examples of areas of statewide concern, "the law of domestic relations, of wills, of inheritance, of contracts, of crimes not essentially local (for

we conclude that livestock facility siting is a "mixed bag" of statewide and local concern. *Michalek,* 77 Wis. 2d at 527 & n.8.

## 2. The *Anchor* Test[17]

¶ 32. When an issue falls into the "mixed bag" category, political subdivisions may adopt "ordinances which, while addressed to local issues, concomitantly regulate matters of statewide concern." *DeRosso,* 200 Wis. 2d at 650 (citing *Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n,* 120 Wis. 2d 391, 395–96, 355 N.W.2d 234 (1984)). However, "this authority is limited to ordinances that complement rather than conflict with the state legislation." *State ex rel. Ziervogel v. Washington Cnty. Bd. of Adjustment,* 2004 WI 23, ¶ 37, 269 Wis. 2d 549, 676 N.W.2d 401. Four factors guide our determination of whether the political subdivision's actions are preempted by the state legislation:[18]

(1) whether the legislature has expressly withdrawn the power of political subdivisions to act; or

(2) whether the political subdivision's actions logically conflict with the state legislation; or

---

example, larceny or forgery), [and] the organization of courts." 222 Wis. at 82 (quoting *Adler v. Deegan,* 167 N.E. 705, 713 (N.Y. 1929) (Cardozo, J.)).

[17] We refer to the four-factor preemption test as the "*Anchor* test" because it first appeared, in its modern form, in *Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n,* 120 Wis. 2d 391, 355 N.W.2d 234 (1984).

[18] Prior cases have applied this test when there have been challenges to political subdivisions' ordinances. The test is also properly applied where, as here, the action of the political subdivision has the force and effect of law.

(3) whether the political subdivision's actions defeat the purpose of the state legislation; or

(4) whether the political subdivision's actions are contrary to the spirit of the state legislation.

*Jackson County v. DNR,* 2006 WI 96, ¶¶ 19–20, 293 Wis. 2d 497, 717 N.W.2d 713 (citing *Mommsen v. Schueller,* 228 Wis. 2d 627, 636–37, 599 N.W.2d 21 (Ct. App. 1999)); *Lake Beulah Mgmt. Dist. v. Vill. of E. Troy,* 2011 WI 55, ¶ 15, 335 Wis. 2d 92, 799 N.W.2d 787; *see also DeRosso,* 200 Wis. 2d at 651–52. Because the test is formulated in the disjunctive, if any one of the factors is met, the political subdivision's conflicting action is void. *DeRosso,* 200 Wis. 2d at 652.

¶ 33. Applying this test, we look to the plain language of the Siting Law to determine whether the Town's actions violate any of the four factors. We conclude that the conditions imposed by the Town violate the first factor because they were an attempt to exercise power expressly withdrawn by the plain language of the Siting Law.[19]

### B. The Legislature Has Expressly Withdrawn the Power of Political Subdivisions to Act in the Field of Livestock Facility Siting

█

¶ 34. To apply the *Anchor* test, we must evaluate the plain language of the statute to determine whether the Town's actions are preempted by the Siting Law.

---

[19] Because we conclude that the Siting Law has expressly withdrawn political subdivisions' power to regulate livestock facility siting, we need not evaluate the other three factors. *Jackson County v. DNR,* 2006 WI 96, ¶ 20, 293 Wis. 2d 497, 717 N.W.2d 713.

This is a matter of statutory interpretation. Therefore, we resort to our standard means of statutory interpretation: an evaluation of the plain meaning.

¶ 35. When interpreting a statute, language is given "its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. Both the context and structure of the statute are relevant to a plain meaning analysis, and the statute is interpreted to "avoid absurd or unreasonable results." *Id.*, ¶ 46.

¶ 36. We begin with the plain language of the statute, and determine that the power of political subdivisions to regulate livestock facility siting has been expressly withdrawn by the legislature. We conclude that the legislature has expressly withdrawn political subdivisions' power to regulate livestock facility siting by: 1) creating uniform state standards that all political subdivisions must follow; 2) mandating that political subdivisions may not disapprove CUPs for livestock facilities, with limited exceptions; and 3) requiring political subdivisions to grant CUPs for livestock facilities.

### 1. The Siting Law Provides for Uniform State Standards

¶ 37. The purpose of the Siting Law, set forth in the plain language of Wis. Stat. § 93.90(1), is to provide "uniform regulation of livestock facilities." To effectuate its goal of uniformity in livestock facility siting, the legislature required the promulgation of a comprehen-

sive statewide livestock siting standard. Wis. Stat. § 93.90(2)(a) (ordering the Department to "promulgate rules specifying standards for siting . . . livestock facilities"). The legislature was careful to provide boundaries to the new regulations. For example, it prohibited the Department from promulgating rules relating to livestock facility siting that conflict with Wis. Stat. § 93.90(2)(a). *Id.* Further, the legislature allowed—but did not require—the Department to incorporate those same sections into its newly-minted state standards.[20] *Id.*

¶ 38. The Town argues that the Department may not, acting on its own, preempt local authority through its regulation. In general, we agree with this principle. However, the Town's argument is not persuasive here because the Department did not act on its own, but instead acted pursuant to the express instruction of the legislature. Put simply, the Department acted precisely how an agency is supposed to act where the legislature has delegated rulemaking authority. Wis. Stat. § 227.11(2)(a) (permitting "[e]ach agency [to] promulgate rules interpreting the provisions of any statute enforced or administered by the agency"); *see Oneida Cnty. v. Converse,* 180 Wis. 2d 120, 125, 508 N.W.2d 416 (1993) ("An administrative agency may not issue a rule that is not expressly or impliedly authorized by the legislature.").

¶ 39. Accordingly, we conclude that by requiring the promulgation of state standards for livestock facility siting, the legislature expressly withdrew the power

---

[20] In promulgating ATCP 51, the Department elected to incorporate multiple state and federal regulations, as well as sections of the Wisconsin statutes. We refer to these regulations as the "state standards." The specific contents of these regulations are not relevant to our analysis.

of political subdivisions to enforce varied and inconsistent livestock facility siting standards.

### 2. The Legislature Has Preempted the Authority of Political Subdivisions to Disapprove Livestock Facility Siting Permits

¶ 40. The Siting Law expressly withdraws political subdivisions' authority to disapprove livestock facility siting permits unless one of eight narrow exceptions applies. Wis. Stat. § 93.90(3)(a) provides, in part: "Notwithstanding ss. 33.455, 59.03(2)(a), 59.69, 60.10(2)(i), 60.61, 60.62, 61.34(1), 61.35, 62.11(5), 62.23, 66.0415, 92.07(2), 92.11, and 92.15(3)(a), a political subdivision *may not disapprove* . . . a livestock facility siting [permit]." (emphasis added).

¶ 41. The Town argues that the meaning of the word "notwithstanding" is ambiguous, and that the proper definition is "in addition to." In other words, the Town asserts that the legislature intended to allow political subdivisions to continue disapproving applications for reasons outside the Siting Law.

¶ 42. The Town cites two cases in which the court did in fact conclude that the term "notwithstanding" was ambiguous. *Maurin v. Hall,* 2004 WI 100, ¶ 36, 274 Wis. 2d 28, 682 N.W.2d 866 (defining "notwithstanding" to mean "in lieu of"); *Bartholomew v. Wisconsin Patients Comp. Fund,* 2006 WI 91, ¶ 84, 293 Wis. 2d 38, 717 N.W.2d 216 (defining "notwithstanding" to mean "in spite of"). Nevertheless, that a term is ambiguous in one context does not render it ambiguous in all. Indeed, in *Maurin* we acknowledged that the meaning of "notwithstanding" can be made clear by the surrounding lan-

468

guage. 274 Wis. 2d 28, ¶ 37 (acknowledging that "the meaning of 'notwithstanding' *by itself* is not clear") (emphasis added).

¶ 43. The ordinary meaning of the term is clear. *Black's* defines "notwithstanding" as "[d]espite; in spite of," *Black's Law Dictionary* 1168 (9th ed. 2009), and lay dictionaries agree, *see, e.g., The American Heritage Dictionary of the English Language* 1238 (3d ed. 1992) (defining "notwithstanding" as "in spite of"). This definition is the only sensible one in light of the Siting Law's purpose: statewide uniformity in the regulation of livestock facility siting. For if "notwithstanding" meant what the Town believes it to mean, there would be no restraints on the ability of political subdivisions to impose a host of diverse standards on the siting process, thus subjecting farm operators to inconsistent conditions. Accordingly, we conclude that Wis. Stat. § 93.90(3)(a) should be read to provide that "[i]n spite of [previous statutory authority afforded to political subdivisions], a political subdivision *may not disapprove* . . . a livestock facility siting [permit]." (emphasis added).

¶ 44. In light of the plain language of Wis. Stat. § 93.90(3)(a), it is clear that the term "notwithstanding" means "in spite of." Therefore, the Siting Law's prohibition on disapproving livestock facility siting permits pertains to *all* such permits, and leaves no authority to the political subdivisions to disapprove permits.

¶ 45. The legislature did create narrow exceptions that allow a political subdivision to disapprove a livestock facility siting permit. Wis. Stat. § 93.90(3)(a)1.-9. (providing the exceptions to the rule that that "a political subdivision may not disapprove or prohibit a livestock facility siting or expansion"). The exception which is pertinent to our analysis is set forth in Wis.

469

Stat. § 93.90(3)(a)6.[21] According to that section, if a political subdivision wishes to disapprove a livestock facility siting permit for failure to satisfy some requirement imposed by a political subdivision but not contained in the Siting Law, the political subdivision must "[a]dopt[] the requirement by ordinance before the applicant files the application for approval," and 2) "[b]ase[] the requirement on reasonable and scientifically defensible findings of fact, adopted by the political subdivision." § 93.90(3)(a)6.a.-b. This requirement ensures that farm operators receive notice of local standards that differ from the state's, and that they are not subjected to arbitrary or unreasonable conditions.

¶ 46. Accordingly, we conclude that the legislature has expressly withdrawn, with limited exceptions, the power formerly reserved to political subdivisions to disapprove livestock facility siting permits.

### 3. The Legislature Has Limited the Conditions a Political Subdivisions May Impose When Granting Livestock Facility Siting Permits

¶ 47. The Siting Law not only expressly withdraws political subdivisions' power to *disapprove* livestock facility siting permits absent some narrow exception, but also expressly withdraws political subdivisions' power to impose certain conditions when they *grant* such permits.[22] When political subdivisions grant a livestock

---

[21] In the interest of brevity, we do not list all of the exceptions in Wis. Stat. § 93.90(3)(a)1.-9.

[22] The two exceptions addressed in paragraphs 61 and 65 are nearly identical. *Compare* Wis. Stat. § 93.90(3)(a)6.a.-b. *with* § 93.90(3)(ar) (requiring identical procedure to either deny a siting permit or approve the permit with additional, "more stringent" conditions). This supports our plain-meaning inter-

facility siting permit, they must condition the permit on compliance "with the applicable state standards." Wis. Stat. § 93.90(3)(ae). This requirement imposed by the legislature upon political subdivisions that grant livestock facility siting permits pertains to *all* such permits, and leaves no authority to the political subdivisions to grant permits in a manner inconsistent with the Siting Law.

¶ 48. Mirroring the requirements of Wis. Stat. § 93.90(3)(a)6 (pertaining to the disapproval of permits), § 93.90(3)(ar) provides that if a political subdivision wishes to grant a livestock facility siting permit and condition it on a requirement not contained in the state standards, it must: 1) "[a]dopt[] the requirement by ordinance before the applicant files the application for approval;" and 2) "[b]ase[] the requirement on reasonable and scientifically defensible findings of fact, adopted by the political subdivision."

¶ 49. We conclude that the legislature has expressly withdrawn the power of a political subdivision to condition the grant of a livestock facility siting permit on any requirement other than the state standards unless the political subdivision has complied with the single, narrow exception contained in § 93.90(3)(ar).

¶ 50. In light of the foregoing, we conclude that the legislature has expressly withdrawn from political subdivisions the power to regulate livestock facility siting in any manner not prescribed by the Siting Law.

pretation that the Siting Law expressly withdraws the power of political subdivisions to regulate, in any manner, livestock facility siting permits, unless they comply with the Siting Law.

It has done so by 1) promulgating uniform state standards designed to supersede local standards, 2) requiring that political subdivisions may not disapprove livestock facility siting permits, and 3) requiring that political subdivisions must condition permits on only the state standards.[23] Therefore, any attempt by the Town to regulate the livestock facility siting process outside the parameters set by the Siting Law is preempted. *Jackson,* 293 Wis. 2d 497, ¶¶ 19–20 (holding that where the legislature has expressly withdrawn the power of political subdivisions to act, any attempt by the subdivision to exercise the withdrawn power is preempted).

¶ 51. The Town's concern that the legislature's preemption of the Town's former power over livestock facility siting will allow water polluters to operate without the threat of sanction is unwarranted. Several actors retain the tools and the authority to regulate water quality. For instance, the WPDES permit, under which Larson operates, makes available enforcement actions for water pollution brought by the federal and state governments, as well as by private individuals. *See generally Domino v. Didion Ethanol, LLC,* 670 F. Supp. 2d 901, 912–13 (W.D. Wis. 2009). Additionally, the state

---

[23] The legislature has, through the exceptions contained in Wis. Stat. § 93.90(3)(a)1.-9. and § 93.90(3)(ar), granted back to political subdivisions a small amount of their former power to regulate livestock facility siting permits. The presence of these exceptions does not mean that the Siting Law failed to expressly withdraw political subdivisions' power in the field of livestock facilities siting. On the contrary, exceptions are the result of a general rule. Here, the general rule is the express withdrawal of political subdivisions' authority to disapprove livestock facility siting permits.

has several enforcement mechanisms available to it for the enforcement of proper environmental standards, including water quality standards. For example, the State, through the DNR and the Department, remains free to promulgate and enforce regulations related to the operation of livestock facilities. Indeed, there are lengthy sections of the administrative code designed to ensure the protection of Wisconsin's waters. *See, e.g.,* Wis. Admin. Code chs. NR 200, 300, 800; Wis. Admin. Code chs. ATCP 31, 50. Nothing in the Siting Law preempts the enforcement of such regulations, so long as the enforcement takes place outside the siting permit application process.[24]

¶ 52. Accordingly, the Town was preempted from regulating livestock facility siting in a manner inconsistent with the Siting Law. Therefore, we conclude that in order for its decision to be upheld, the Town must have demonstrated that it met one of the narrow exceptions in the Siting Law in order to regulate livestock facility siting.

---

[24] The dissent believes that it is "absurd" for conditions in a siting permit to be void under the Siting Law when at the same time "the Town has the power to regulate the operations of the livestock facility" in other ways. Dissent, ¶ 69. "It doesn't make any sense" to the dissent "to interpret the Siting Law as prohibiting a political subdivision from granting a permit with otherwise valid conditions regulating the livestock facility" while at the same time "interpret[ing] the Siting Law as invalidating the permit conditions yet allowing the political subdivision to impose the same conditions on the operation of the livestock facility and to pursue remedies against a polluting facility." Dissent, ¶ 99. The distinction between livestock facility siting and livestock facility operations may not "make any sense" to the dissent, but it surely made sense to the legislature, given that the entire Siting Law is premised on that distinction. To ignore the distinction in this case, as the dissent does, is to ignore the entire framework and content of the statute, beginning with its title.

## C. The Challenged Conditions Failed to Satisfy the Narrow Exception Set Forth in § 93.90(3)(Ar) Because the Town Failed to Adopt Fact-Finding to Support Any of the Requirements Imposed in the CUP

■

¶ 53. The Town was preempted from acting outside the parameters of the Siting Law in the permitting process. Therefore, the question is whether the Town passed its zoning ordinance—and imposed its conditions—in accordance with the procedures laid out by the Siting Law. We hold that it did not.

¶ 54. There is only one mechanism in the Siting Law that allows a political subdivision to condition a permit on standards outside of those contained in ATCP 51, and that mechanism is set forth in Wis. Stat. § 93.90(3)(ar) (allowing political subdivisions to impose conditions based on more stringent standards if they were adopted by the subdivision before the application was filed and were based on findings adopted by the subdivision). The legislature's decision to afford but a single avenue for the imposition of such conditions underscores that it is the only vehicle for political subdivisions to use if they want to reach outside the standards incorporated by the regulations themselves. *See Groh v. Groh,* 110 Wis. 2d 117, 125, 327 N.W.2d 655 (1982) (applying the statutory canon of *expressio unius est exclusion alterius,*[25] "the legislature's failure to specifically confer [a] power is evidence of legislative intent not to permit the exercise of the power."); *Daimler-*

---

[25] *Expressio unius est exclusion alterius* is roughly translated as "to express or include one thing implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* 661 (9th ed. 2009).

*Chrysler v. LIRC,* 2007 WI 15, ¶ 29, 299 Wis. 2d 1, 727 N.W.2d 311 (holding that statutory canons are applied to the interpretation of rules promulgated by administrative agencies).

¶ 55. Pursuant to Wis. Stat. § 93.90(3)(ar)2., a political subdivision may impose a condition more stringent than the state standards only if it grounds its conditions "on reasonable and scientifically defensible findings of fact, adopted by the political subdivision."[26]

¶ 56. For the reasons that follow, we conclude that none of the conditions the Town imposed were based on fact-finding the Town adopted. As a result, we hold that the Town improperly imposed all of the challenged conditions.

---

[26] We note that several additional questions are implicated by the parties' arguments, including: whether the Town timely incorporated the four administrative chapters imposed in condition five of the CUP, as required by Wis. Stat. § 93.90(3)(ar)1.; whether a political subdivision may condition a permit on a requirement that does not appear to be a "standard" at all, let alone a "more stringent" one (e.g., rights of access, exchange of information, annual review of a CUP, etc.); whether a subdivision may condition a permit on requirements that fall under categories other than those regulated by the state in the sections incorporated by ATCP 51 (e.g., if ATCP 51 incorporated restrictions on phosphorous but not nitrogen, and the Town sought to regulate the latter); and whether a "more stringent" analysis may be conducted with reference to "narrative" standards that offer general, verbal prescriptions, as opposed to "performance" standards, which include precise, numerical limitations. *Cf. Pennaco Energy, Inc. v. Mont. Bd. of Envtl. Review,* 199 P.3d 191, 200 (Mont. 2008) (affirming a trial court's conclusion that "because there were no corresponding federal numeric standards . . . [the] adoption of numeric standards was not 'more stringent' than a federal standard"). Because resolution of these questions is not required by the instant case, we save these questions for another day.

¶ 57. The Town insists that Wis. Stat. § 93.90(3)(ar)2. "does not specify who must create reasonable and scientifically defensible findings of fact." It is true that the provision is silent on who "creates" the findings, but that is not the question here. The issue is who must *adopt* the findings, and the provision is clear on this point: the Town must. We reject the Town's attempt to inject ambiguity into unambiguous statutory language. *Bruno v. Milwaukee Cnty.,* 2003 WI 28, ¶ 25, 260 Wis. 2d 633, 660 N.W.2d 656 (2003) ("Statutory interpretation involves the ascertainment of meaning, not a search for ambiguity."); *accord Kalal,* 271 Wis. 2d 633, ¶ 47.

■■■■

¶ 58. Aside from this and similar word-play,[27] the only rationale advanced by the Town in support of its position that it properly adopted fact-finding to warrant the imposition of the conditions in the CUP is that it *implicitly* adopted the facts found by the state to justify the state standards. There is no authority for a political subdivision to implicitly adopt any fact-finding by any entity for the purpose of satisfying the requirements of Wis. Stat. § 93.90(3)(ar)2., nor, indeed, for any other purpose. Although there are circumstances in which implicit fact-finding is permissible, *see, e.g., State v. Echols,* 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993)

---

[27] For instance, Adams writes that the Town's water quality ordinance was "based upon reasonable and scientifically defensible factual findings because it adopts state water quality standards." This argument blurs the crucial distinction between *basing* a standard on fact-finding and actually *adopting* the fact-finding. Furthermore, even if the argument were valid it would have no bearing on this case, because there is no indication that the Town did in fact base the standards imposed in the CUP on the state's fact-finding.

(discussing judicial fact-finding), it may not be done in the face of an express legislative demand for actual adoption. This is so because we must give effect to every requirement in the statute, *Kalal,* 271 Wis. 2d 633, ¶ 46, and the law requires the adoption of fact-finding *by the Town.*

¶ 59. Accordingly, we conclude that because the Town failed to adopt fact-finding to support the standards it sought to impose in the CUP, all of the challenged conditions were infirm under Wis. Stat. § 93.90(3)(ar)2.[28]

## D. The Siting Board Was Entitled to Modify the CUP

■■■

¶ 60. Having concluded that the conditions in the permit were improper, there remains the question of what the Siting Board was supposed to do with them. It could have reversed the Town's decision in its entirety, restoring the parties to the position they were in before Larson filed the application. Instead, it modified the CUP, striking conditions one, three, five, and seven as invalid, narrowing condition two as overbroad, and affirming the unchallenged conditions (four and six). We agree with the court of appeals that the Board acted properly.

¶ 61. The Siting Law instructs the Siting Board that it "shall," if it determines that a challenge is justified, "reverse the decision of the political subdivi-

---

[28] Like the court of appeals, we express no view on whether a political subdivision may, under certain circumstances, adopt fact-finding conducted by the state or other political entities when the subdivision incorporates standards set forth elsewhere into its local siting process.

sion." Wis. Stat. § 93.90(5)(d). In the Town's view, this provision compels the Board to outright reverse improper permits rather than modify them. We disagree.

¶ 62. It is true, as the Town observes, that an administrative agency has "only those powers which are expressly conferred or which are necessarily implied by the statutes under which it operates." *Wisconsin Citizens Concerned for Cranes and Doves v. DNR,* 2004 WI 40, ¶ 14, 270 Wis. 2d 318, 677 N.W.2d 612 (quoting *Kimberly-Clark Corp. v. PSC,* 110 Wis. 2d 455, 461–62, 329 N.W.2d 143 (1983)). Understandably, the Town zeroes in on the first clause: expressly conferred. We consider both, and hold that the Siting Board properly exercised an implied power under the statute.

¶ 63. Our holding is compelled by the unusual circumstances of the case. First, the Town committed the initial error that the Siting Board was required by law to rectify. The Town imposed the impermissible, extra-legal conditions. It would make little sense, therefore, to read the Siting Law as prohibiting the Siting Board from correcting the problem in as efficient a manner as possible.

¶ 64. In the same vein, the Siting Law and ATCP 51 were plainly designed to facilitate the speedy approval of proper siting applications. *See, e.g.,* DATCP Analysis, Business Impact (noting that, under old regime, some "operators, though ultimately successful, incurred extraordinary (and often unnecessary) costs and delays"). It would significantly frustrate that purpose to invalidate the Siting Board's action precisely because it was the most efficient option available. In other words, long and unnecessary delays in the process were the problem, and it would only compound that problem to "reward" farm operators challenging invalid

CUPs by returning them to the beginning of the application process. *See, e.g.,* DATCP Analysis, Business Impact (stating that under old regime, some "operators, though ultimately successful, incurred extraordinary (and often unnecessary) costs and delays"). Such an outcome would render many of the other carefully designed components of the statute meaningless. *Kalal,* 271 Wis. 2d 633, ¶ 46 (holding that context and structure of the statute are relevant to interpretation).

¶ 65. Moreover, the unique procedural posture the appeal was in when it reached the Siting Board put the Board in an extremely difficult, almost untenable, position. It would be absurd for the Siting Board to tell Larson, which filed an application more than four years ago and was entitled to a permit shortly thereafter, that it was required to return to the beginning of the application process because of the Town's mistake. Accordingly, we conclude that the Siting Board acted properly pursuant to an implied power.[29] [30]

[29] Our holding today regarding the Siting Board's authority is a narrow one. We hold that when, as here, a political subdivision imposes conditions not authorized by the Siting Law or ATCP 51, the Siting Board may modify the conditions so as to render them in conformity with the Siting Law. In such a circumstance, the Siting Board need not return the farm operator to the beginning of the application process, which it has already properly completed. We do not address situations that may arise with respect to other agencies, and we craft no exceptions to the well-settled rules of administrative law.

[30] Our decision does not leave political subdivisions without recourse against polluters. Most importantly, political subdivisions retain the authority to bring nuisance abatement actions against polluting farms. *See* Wis. Stat. § 823.01. More generally, this decision does not speak to political subdivisions' ability to regulate livestock facility *operations*. It simply says that the

## V. CONCLUSION

¶ 66. In Wisconsin, as in states all over the country, the legislature has taken steps to balance the important interest in protecting precious natural resources with the important interest in encouraging a robust and efficient agricultural economy. As a central component of balancing these interests, the legislature has strictly limited the ability of political subdivisions to regulate the livestock facility siting process. The Town stepped over those limitations when it impermissibly conditioned the terms of a siting permit without following the guidelines set forth by the legislature. Because the Town's actions were violative of the Siting Law, the court of appeals was correct to find the challenged conditions in the permit invalid, and we therefore affirm.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 67. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). This is the first case that the Wisconsin Livestock Facility Siting Review Board has had involving Wis. Stat. § 93.90, the Siting Law. It is also the first Siting Law case to come to this court.

¶ 68. The Siting Law is a complex statute. It is difficult to fit its various provisions together with the related provisions of the Wisconsin Administrative Code and apply them in a coherent, cohesive manner. As counsel for Larson Acres wryly observed in response to a question about the complexity of the Siting Law, the Law "require[s] a fair amount of close attention."

¶ 69. I write separately for three reasons:

---

legislature has forbidden them from regulating livestock facility *siting* except as permitted by the Siting Law.

I. The majority opinion's analysis of the text of the Siting Law as expressly withdrawing the powers at issue from the Town is not a reasonable interpretation and application of preemption law to the Siting Law.

II. The majority opinion's interpretation of the Siting Law reaches an absurd result. The majority opinion voids conditions the Town imposed, although it acknowledges that regardless of the permit, the Town has the power to regulate the operations of the livestock facility.

III. The majority opinion violates the plain language of Wis. Stat. § 93.90(5)(d) in concluding that the Siting Board may modify conditions the Town imposed in granting a siting permit.

I

¶ 70. The majority opinion's analysis of the text of the Siting Law as expressly withdrawing the powers at issue from the Town is not a reasonable interpretation and application of preemption law to the Siting Law. No such express language can be found. According to the Siting Law, the Siting Board, the Department of Agriculture, Trade and Consumer Protection, and local governments exercise power over siting of livestock facilities.

¶ 71. As the majority correctly recognizes, livestock facility siting is a matter of statewide concern, but it is not a matter of exclusively statewide concern. Majority op., ¶ 31. Rather, livestock facility siting has traditionally been regulated at the local level. Although Wis. Stat. § 93.90(1) provides that the Siting Law "is an enactment of statewide concern," this court has ex-

481

plained that "[l]abelling a matter one of statewide concern does not . . . automatically void local regulation."[1]

¶ 72. The Siting Law does not establish a statewide permitting system. Rather, the Siting Law empowers political subdivisions to disapprove siting permits under certain circumstances and to issue special exceptions or conditional use permits under certain circumstances. The Siting Law limits the power of political subdivisions in siting permits, but does not withdraw all authority of political subdivisions over livestock facilities.

¶ 73. It is true that the Siting Law is geared toward providing more uniformity in decision making related to siting livestock facilities. Wis. Stat. § 93.90(1). To achieve this goal, the legislature empowered the Department of Agriculture, Trade and Consumer Protection (the Department) to promulgate certain standards for siting permits that will apply statewide.[2] The Department has developed standards on several subjects, including livestock structures, odor, nutrient management, waste storage facilities, and run-off management. Wis. Admin. Code § ATCP 51.12–.20 (Apr. 2009).

---

[1] *DeRosso Landfill Co.* v. City of Oak Creek, 200 Wis. 2d 642, 650, 547 N.W.2d 770 (1996).

[2] *See* Wis. Stat. § 93.90(2)(a):

For the purposes of this section, the department shall promulgate rules specifying standards for siting and expanding livestock facilities. In promulgating the rules, the department may incorporate by cross-reference provisions contained in rules promulgated under ss. 92.05(3)(c) and (k), 92.14(8), 92.16, and 281.16(3) and ch. 283. The department may not promulgate rules under this paragraph that conflict with rules promulgated under s. 92.05(3)(c) or (k), 92.14(8), 92.16, or 281.16(3) or ch. 283.

¶ 74. Nevertheless, the Siting Law explicitly allows differences in political subdivisions granting and denying permits across the state. Even in relation to topics that the Department has addressed, such as odor, towns may impose "more stringent" conditions if they satisfy the prerequisites of Wis. Stat. § 93.90(3)(ar). Additionally, nothing in the text of the Siting Law or Chapter 51 of the Administrative Code explicitly prohibits towns from imposing conditions relating to subjects that the Department has not addressed.

¶ 75. Finally, the Siting Law does not govern all the operations of the livestock facility. Nothing in the Siting Law withdraws the authority of a political subdivision to regulate the ongoing operations of a livestock facility.

¶ 76. Even with a "fair amount of close attention," it is difficult to conclude, as the majority opinion does, that the Town's power to impose its conditions was "expressly withdrawn by the plain language of the Siting Law."[3] Majority op., ¶ 33.

¶ 77. The majority begins its analysis by stating that "the legislature expressly withdrew the power of

---

[3] The test for whether local action is preempted by a state statute was first fully articulated by this court in *Anchor Savings & Loan Ass'n v. Equal Opportunities Commission,* 120 Wis. 2d 391, 395–96, 355 N.W.2d 234 (1984). Although the majority refers to the *Anchor* test as having four "factors," majority op., ¶ 32, the *Anchor* test actually sets forth four independent ways in which preemption may be found: (1) The legislature has expressly withdrawn the power of municipalities to act; (2) the ordinance logically conflicts with the state legislation; (3) the ordinance defeats the purpose of the state legislation; or (4) the ordinance goes against the spirit of the state legislation. *Anchor,* 120 Wis. 2d at 397. The second, third, and fourth forms of preemption seem very similar.

political subdivisions to enforce varied and inconsistent livestock facility siting standards" by "requiring the promulgation of state standards for livestock facility siting." Majority op., ¶ 39. The majority opinion does not explain how delegating rule-making power to the Department constitutes *express* withdrawal of power from political subdivisions. After painting with a broad brush, the majority opinion quickly concludes that the specific content of the Department rules is not relevant to its analysis. Majority op., ¶ 37 n.20.

¶ 78. The majority then turns to Wis. Stat. § 93.90(3), the provision detailing the power of political subdivisions to disapprove and conditionally approve a siting application. The majority reads Wis. Stat. § 93.90(3)(a) as providing nine grounds on which a political subdivision may reject a siting application and concludes that other grounds for rejecting a siting application are "expressly withdrawn." Majority op., ¶¶ 44–46. The majority further concludes that because the legislature has required political subdivisions to require compliance with the Department's statewide standards and the legislature has also authorized political subdivisions to impose certain conditions on the granting of a conditional use siting permit, it has "expressly withdrawn the power of a political subdivision to condition the grant" on any other grounds. Majority op., ¶ 49.

¶ 79. In other words, according to the majority opinion, the Siting Law has expressly withdrawn local control because: (1) the Town can deny a permit only if one of the nine grounds is met; (2) the Town must require compliance with Department rules in granting a permit; and (3) the Town can impose conditions more stringent than the Department rules only if the Town meets certain statutory prerequisites.

484

¶ 80. Because the majority must concede that that political subdivisions retain some authority over siting permits, the majority opinion intermittently backs away from its "express withdrawal" rationale. Thus the majority opinion occasionally switches its reasoning to analyze whether the Town's actions are "inconsistent" with the Siting Law. Majority op. ¶¶ 47, 51. Furthermore, the majority opinion explains in a footnote that although the legislation does not expressly withdraw all powers from the political subdivisions, the majority opinion interprets the statute as creating a general rule that all powers are withdrawn from the political subdivisions except those expressly permitted by the siting statute. Majority op., ¶ 50 n.23. So much for the statute expressly withdrawing powers from political subdivisions!

¶ 81. Because the Siting Law expressly empowers both political subdivisions and the State to govern the siting of livestock facilities, I would analyze the instant case and determine the preemption issue by asking whether the Town's exercise of power conflicts with the Siting Law, defeats the purpose of the Siting Law, or goes against the spirit of the Siting Law.

II

¶ 82. The majority opinion's interpretation of the Siting Law reaches an absurd result. The majority opinion voids conditions the Town imposed, although it acknowledges that regardless of the permit, the Town has the power to regulate the operations of the livestock facility.

¶ 83. The majority opinion, ¶ 65 n.30, and Larson Acres recognize that the Siting Law does not deprive a political subdivision of authority to enforce existing

laws not contained in the Siting Law against a livestock facility. The Siting Law does not preclude a political subdivision from regulating a livestock facility.

¶ 84. Indeed, applicants for a local siting permit must acknowledge that laws other than the Siting Law apply to livestock operations and that violation of these other laws may have consequences. The siting application form provides that many substantive laws beyond the rules promulgated by the Department "may apply to the operation of a livestock facility." The application form explains that "[l]ocal approval of a livestock facility siting application is NOT based on these laws, except as specifically provided in [Wis. Admin. Code §] ATCP 51," but that "violations may have other legal consequences . . . ."

¶ 85. In the present case, the Town granted Larson Acres the permit. The Town imposed seven conditions it concluded were needed to enforce state water quality standards. The Siting Law has provisions that govern a Town's *granting* a permit. *See* Wis. Stat. § 93.90(3)(ae), (am), (ar).

¶ 86. In other provisions, the Siting Law limits a political subdivision in *disapproving or prohibiting* a livestock facility siting. A political subdivision "may not disapprove or prohibit a livestock facility siting or expansion unless at least one of the" circumstances set forth in Wis. Stat. § 90.93(3)(a)1.-9. applies.

¶ 87. The Siting Board and the majority opinion read Wis. Stat. § 93.90(3)(a), which governs disapproving a permit, to mean that a political subdivision is required to approve unconditionally a siting application except under the limited circumstances for disapproval set forth in § 90.93(3)(a)1.-9. and the limited circumstances for conditional approval set forth in § 93.90(3)(ae), (am), and (ar). This reading is not com-

pelled by the plain text of the Siting Law. The provisions governing the disapproval of a siting application and the provisions governing the granting of a conditional use permit are separate provisions in the statute and should be read separately.

¶ 88. I now turn to the conditions the Town imposed in granting the permit. The Town asserts in effect that all seven conditions are necessary to ensure Larson Acres' compliance with state water quality standards and that the Town has the power (outside the Siting Law) to impose these conditions. For purposes of this dissent, I accept these assertions. The majority opinion, the Siting Board, and Larson Acres do not appear to challenge the Town's power to regulate the facility's ongoing operations in terms of state water quality standards. Rather, they maintain that the Town cannot regulate water quality standards by including these conditions in the siting permit.

¶ 89. Should the Town's conditions in the siting permit be upheld, the question may arise regarding the remedies the Town has if Larson Acres does not comply with one of the conditions. Larson Acres assumes the Town would revoke or withdraw the siting permit should Larson Acres not comply with a condition, which it contends would be akin to rejecting the siting permit in the first instance. The Town does not discuss its powers to enforce the conditions in the event of a violation if they were held to be valid conditions in the present case. I do not address this issue because the Town is not attempting to revoke or withdraw the permit in the present case.[4] I recognize, as the parties and the majority opinion do, that the Town may have

_____

[4] Wis. Admin. Code § ATCP 51.34(4)(b) identifies circumstances under which a siting permit may be withdrawn.

means other than permit revocation or withdrawal, such as mandamus or injunctive relief, to enforce the conditions.

¶ 90. Although it is within the power of the Department to promulgate rules under the Siting Law regarding water quality, Wis. Stat. § 93.90(2)(a), the Department has not done so. The Siting Law expressly limits the Department's rule-making power were the Department to promulgate rules regarding water quality: the rules may not conflict with several existing water quality statutes. Wis. Stat. § 93.90(2)(a). Under these circumstances, in my opinion, any permit conditions based on state water quality standards are consistent with and are not preempted by the Siting Law.

¶ 91. Moreover, because the Department has not promulgated rules regulating water quality under Wis. Stat. § 93.90(2)(a), a plain reading of the text of the Siting Law is that the Town's imposition of a condition relating to water quality in granting a permit is not the imposition of a "more stringent [condition] than the state standards under sub. (2)(a) [of the Siting Law]." *See* Wis. Stat. § 93.90(3)(ar).

¶ 92. The Siting Board narrowed Town condition number 2. It affirmed, without explanation, conditions 4 and 6, which were not challenged. The Siting Board struck conditions 1, 3, 5, and 7 as "an incorrect application of the Law and the regulations" or as "in excess of the Town's authority."

¶ 93. Some of the Town's conditions (like conditions 2, 3, 4, and 6) are notice-type or access-type requirements relating to water quality that would allow the Town to be in a position to enforce existing water quality laws.

¶ 94. Do such conditions requiring notice or access contravene the express language of the Siting Law?

488

The Town's access to information is not expressly withdrawn, revoked, or restricted by the Siting Law. Do these conditions conflict with the Siting Law? Defeat the purpose of the Siting Law? Or go against the spirit of the Siting Law? I think not.

¶ 95. Wisconsin Admin. Code § ATCP 51.34(4) provides that "[chapter 51] does not limit a political subdivision's authority to . . . (a) [m]onitor compliance . . . ." It is certainly arguable that these "notice-type" conditions are for the purpose of monitoring compliance with applicable laws.[5] The Board has interpreted "monitoring compliance" as limited to monitoring compliance with standards pursuant to ch. ATCP 51, subchapter II, of the Administrative Code. This is not the only reasonable reading of Wis. Admin. Code § ATCP 51.34(4)(a). One could argue that the provision gives the Town authority to monitor compliance with all state water quality statutes, not just the rules promulgated by the Department. In any event, even if the "monitor compliance" regulation expressly allows the Town to monitor compliance only with state standards adopted by the Department, why does the Town need express authority in the Siting Law or Depart-

---

[5] Furthermore, Wis. Stat. § 93.90(5)(c) provides that the Siting Board, in deciding a challenge involving the application of requirements relating to water quality, must consult with either the Department or the Department of Natural Resources:

> In a case that involves the application of requirements related to water quality, the board shall consult with the department of agriculture, trade and consumer protection or with the department of natural resources concerning the application of the requirement related to water quality.

The court of appeals viewed this provision as inapplicable. The parties do not refer to this provision and its application to the water quality conditions the Town imposed is not clear.

ment rules to monitor compliance with other laws not addressed by the Siting Law or the Department?

¶ 96. I think it more in keeping with the language, purpose, and spirit of the Siting Law to allow a political subdivision to grant a siting permit and impose conditions relating to regulation of the facility, conditions that complement the Siting Law and that enable the political subdivision to act within its granted powers.

¶ 97. In sum, assuming that the Town's conditions relating to operating the facility are consistent with state water quality standards and the Town's powers (aside from the Siting Law), I conclude the conditions are not preempted by the Siting Law or Department rules. The Town granted the permit and Larson Acres can comply with both the Siting Law and the conditions the Town required.[6]

¶ 98. According to the majority opinion, after a siting permit is granted, a political subdivision may seek redress against the facility if it violates a law.[7] The majority's position that siting and regulation of the operations of the livestock facility are separate spheres results in regulatory inefficiency and is inconsistent with the goal of the Siting Law to provide consistency and predictability to large livestock operations.[8]

---

[6] Again, the instant case does not raise the question of the power of the Town over the siting permit should the facility violate any of the conditions.

[7] *See* majority op., ¶ 65 n.30.

[8] The Town illustrates the difference between siting "licensing" [technical standards] and "regulation" [performance standards] as follows:

> State "technical standards" for a [driver's] license require a driver be of age, have good eyesight, and show knowledge of the rules of the road and the ability to competently operate a motor vehicle.

¶ 99. It doesn't make any sense to me on the one hand to interpret the Siting Law as prohibiting a political subdivision from granting a permit with otherwise valid conditions regulating the livestock facility, and on the other hand to interpret the Siting Law as invalidating the permit conditions yet allowing the political subdivision to impose the same conditions on the operation of the livestock facility and to pursue remedies against a polluting facility.

¶ 100. Lastly, even if the Board and majority opinion are correct in their interpretation of the Siting Law, the Board's decision and the majority opinion are each internally inconsistent. Why do they allow any conditions to be imposed by the Town except the one condition set forth in the Siting Law, namely that the facility must comply with applicable state standards under Wis. Stat. § 93.90(2)(a)? *See* Wis. Stat. § 93.90(3)(ae).

¶ 101. The Siting Law, Wis. Stat. § 93.90(3)(ae), requires a political subdivision granting a conditional use permit to impose one condition—compliance with applicable state standards under Wis. Stat. § 93.90(2)(a). The Town did not include this condition in granting the permit, and the Siting Board required the Town to include the condition. As I understand the reasoning of the Siting Board and the majority opinion, this condition should be the only condition the Town may impose. Yet the Board explicitly affirmed other conditions.

¶ 102. For the reasons set forth, I conclude that the Siting Law does not prohibit a Town from granting a siting permit with conditions relating to state water

---

But a licensed driver must still conform to "performance standards" of traffic laws which protect the safety of other citizens. Just as a driver's license does not give the right to speed, compliance with "siting standards" does not give a CAFO the right to pollute.

quality standards if the Town otherwise has the power to adopt such conditions to protect local water quality, because neither the Siting Law nor the Department rules regulate water quality and the Department is prohibited from promulgating rules that violate state water standards.

## III

¶ 103. The majority opinion violates the plain language of Wis. Stat. § 93.90(5)(d) in concluding that the Siting Board may modify conditions the Town imposed in granting a siting permit.

¶ 104. I agree with the circuit court that the Siting Board acted outside its lawful statutory authority when it modified the conditions of the permit. The Siting Law limits the Siting Board's options to outright reversal or affirmance of challenged permits. The Siting Law provides, inter alia, in Wis. Stat. § 93.90(5)(d):

> If the board determines that a challenge is valid, the board *shall reverse* the decision of the political subdivision (emphasis added).

¶ 105. Thus, upon finding a valid challenge to the Town's permit, the Siting Board must reverse the decision of the Town to grant the permit. The Siting Law does not authorize the Siting Board to modify conditions imposed by a political subdivision that grants a permit.

¶ 106. As this court is fond of saying in statutory interpretation cases: Had the legislature intended a particular interpretation, it knows how to express itself.[9] When the legislature empowers an agency to

---

[9] *See, e.g., State v. Arends,* 2010 WI 46, ¶ 37, 325 Wis. 2d 1, 784 N.W.2d 513; *State v. Smith,* 2010 WI 16, ¶ 21, 323 Wis. 2d

modify or otherwise alter a decision, it says so explicitly. *See, e.g.,* Wis. Stat. §§ 102.18(4)(c)1.; 108.09(3)(b); 111.39(5)(b). It did not do so in the Siting Law.

¶ 107. The Siting Board's bylaws explicitly confirm the limitations on its actions. The bylaws state that the Siting Board "has quasi-adjudicatory authority to perform the following functions: . . . Affirm the decision of the political subdivision or reverse that decision based on whether or not the challenge is valid. . . ."[10]

¶ 108. The Siting Board's deliberations in the present case demonstrate its concern that it lacked authority to modify permit conditions independently of the decision whether to grant the permit at all.

¶ 109. The majority opinion apparently agrees that the statute does not expressly empower the Siting Board to modify the permit and holds that the Siting Board has "implied power" to modify a permit.[11] It is not clear from whence cometh this implied power. The majority thus contravenes the plain language of the statute and tries to make its extension of the plain text palatable by characterizing its holding expanding the Siting Board's authority as "a narrow one."[12]

¶ 110. I acknowledge the dilemma in interpreting this provision of the Siting Law. Applying the plain language to limit the Siting Board's power only to affirm or reverse the Town's decision might enable

377, 780 N.W.2d 90; *Aslakson v. Gallagher Bassett Services, Inc.,* 2007 WI 39, ¶ 51, 300 Wis. 2d 92, 729 N.W.2d 712.

[10] Wis. Livestock Facility Review Siting Board Bylaws § IV.A., *available at* http://datcp.wi.gov/uploads/Environment/pdf/LFSRBBylawsAppendixA.pdf (last visited July 3, 2012).

[11] Majority op., ¶ 65.

[12] Majority op., ¶ 65 n.29.

political subdivisions to manipulate the statute to avoid ever granting a permit and might, as the majority opinion and court of appeals point out, lead to absurd results.[13]

¶ 111. As the court of appeals acknowledges, however, situations may exist in which, had the political subdivision known that a condition would be stricken, it might have imposed an alternative proper condition or denied the permit.[14] The Town makes this argument in this court.

¶ 112. As the majority opinion notes, ¶ 11, the Town asserts that during its hearing it explicitly stated that Larson Acres' nitrate pollution gave it a basis to reject the permit if it did not impose permit conditions. Yet the Siting Board ignored the Town's statement in the record and stripped away the permit conditions the Town found necessary to grant the permit.

¶ 113. After considering the plain language of Wis. Stat. § 93.90(5)(d) and the policy arguments in favor of and in opposition to the expansion of the powers of the Siting Board beyond affirming or revers-

---

[13] As the court of appeals noted, however, we should not presume that the Town would act in bad faith in order to delay the siting process were it given another opportunity to consider the application. If it did become clear that a town was attempting to game the system, the courts would be capable of addressing the problem in individual cases.

[14] Indeed the court of appeals acknowledged that "had the municipality known that a critical condition was defective, it could have imposed an alternative proper condition. We leave this issue for another day. Here, the Town has not made the alternative argument that, if its statutory interpretation argument is wrong, the matter should be remanded so that the Town may attach alternative *proper* conditions." *Adams v. State Livestock Facilities Siting Review Bd.,* 2010 WI App 88, ¶ 51, 327 Wis. 2d 676, 787 N.W.2d 941.

ing the siting permit, I agree with the circuit court that the Siting Board exceeded its authority in striking some of the conditions. I conclude that it is the legislature's task, not that of this court, to amend the text of the Siting Law.

¶ 114. Thus, even if I were to agree (and I do not) with the Siting Board and majority opinion that some of the Town's conditions violated the Siting Law, I would conclude that the cause should be remanded to the Siting Board with directions either to reverse or affirm the Town's permit in its entirety.

¶ 115. For the reasons set forth, I dissent.

¶ 116. I am authorized to state that Justice ANN WALSH BRADLEY joins part III of this dissent.